## INVALID GIFT BY AN AGED WOMAN.

Court of Appeals for Hamilton County.

ANNIE LAWS AND ALICE LAWS v. JAMES M. MORLEY ET AL, AD-
MINISTRATORS OF ELLEN LEHANE, DECEASED.

Decided, December 13, 1915.

*Action for Recovery of Corporate Stock—Validity of Gift of, Denied—
Contractual and Testamentary Capacity Distinguished.*

1. An action for recovery of the value of corporate stock, received by
   the defendant as a gift from one alleged to have been incompetent
   by reason of senility, is an action for the recovery of money only
   where the stock has been transferred by the donee.
2. It is not error to permit, during trial, an amendment which elimi-
   nates a charge of fraud and substitutes therefor a charge of undue
   influence; particularly where the jury subsequently found that the
   decedent (the donor) was of unsound mind but that no undue in-
   fluence was exerted; nor is it error to refuse a continuance be-
   cause of such an amendment.
3. Contractual rather than testamentary capacity is required to uphold
   a gift of corporate stock, made by an aged woman without immedi-
   ate prospect of death and rendered immediately effective by as-
   signment and delivery.

*DeCamp & Sutphin,* for plaintiffs in error.
*Horstman & Horstman,* contra.

JONES (Oliver B.), J.

The action under review in these proceedings was brought in
the common pleas court by defendants in error, who were plaint-
iffs below, as the administrators of Ellen Lehane, deceased,
against plaintiffs in error, who were defendants below, to re-
cover the value of twenty-seven shares of preferred stock in
the Procter & Gamble Company, which had been transferred by
her without consideration to one of the defendants for the bene-
fit of both, five days before her death.

Ellen Lehane had been employed as a servant in the household
of their parents from the time defendants were small children
and after their parents' death remained with them in the same

capacity continuously until defendants removed from their old homestead on Dayton street into a new home upon the hill, when Miss Lehane, then seventy-five years of age, concluded to give up active work, and secured quarters with friends or relatives, living thus upon her income for a period of about five years, during the remainder of her life. She had lived as a faithful servant in defendants' family for a period, in all, of forty-three years.

While her wages were small, she was frugal in her habits, was under little expense, and had carefully saved, depositing money from time to time in a savings bank, from 1895 up to the time of her death. Her accumulations thus made were invested partly in the Procter & Gamble stock in question in this case, which was purchased about the time of the organization of that company in 1890, and partly in stock of the American Sugar Refining Company and American Locomotive Company, which was purchased in parcels from time to time, in 1907 and previous thereto. These investments were made with the advice and assistance of the brother of the defendants.

While Ellen Lehane was living with defendants and their family her relations with them were of an intimate and friendly character. The defendants were looked upon by her as confidential friends and advisers and they continued in that relation up to the time of her death, looking after her personal comfort and assisting her in her business matters. She could neither read nor write; she signed her name with a mark. One of the defendants would draw checks for her on her account in the savings bank and would collect the dividends on her stocks, bringing her the cash for them. They arranged for a telephone in her room so they could converse with her at will, and by means of which she could reach them whenever she wished to or needed their assistance. They called upon her at her room from time to time, and frequently made her little presents.

Ellen Lehane had never married, and she had no brothers or sisters living at the time she left the service of the defendants, but she had numerous relatives, descendants of deceased sisters, with whom she was on good terms, and especially one nephew of whom she was quite proud, the Reverend P. P. Crane,

a Catholic priest who lived in St. Louis, and Mrs. May Sommers Soards, a grand-niece, of whom she was quite fond, and with whom she lived for a time, and who remained attentive to her up to the time of her death.

The stocks which constituted the small fortune of Ellen Lehane were at her request kept for her by the brother of the defendants in his safe deposit box. At a meeting in his office in 1907, when Mr. Laws and Miss Annie Laws were present with Ellen Lehane, she executed assignment blanks assigning all the sugar and locomotive stock to her nephew, Father P. P. Crane. The transfer of this stock was not then made, but the stock and the assignments were left with Mr. Laws to give to Father Crane at her death, and no change was made as to the dividends which were to continue to be paid to her during her lifetime, to live upon. These assignments were kept by Mr. Laws until after her death, when he sent them to the respective companies and had new certificates made in the name of Father Crane and delivered them to him as hereinafter stated.

On Monday morning, October 28, 1912, May Sommers Soards visited her aunt at her home and found her prepared to go out with one of the defendants to Mr. Law's office, but learning that she did not feel well, Mrs. Soards at her request telephoned Miss Laws and postponed the trip until the next day. On the following day, Tuesday, at about ten o'clock Miss Alice Laws called at the Phelan home where Ellen Lehane then lived, at Broadway and New street, and together they walked to Mr. Law's office in the First National Bank Building at Fourth and Walnut streets. There they met Mr. Laws in his private office where, he says, he was told by Ellen Lehane that she desired to give her Procter & Gamble stock to "her girls," as she called the defendants, that they had been kind to her and she wished to return their kindness. He says he told her that if she gave it to them she should "give it to them out and out, without any strings to it," and she said that was what she wanted to do. Thereupon he sent his son, who was in the office, to the safe deposit box for the certificate of stock, and had his bookkeeper, Mr. Muller, prepare an assignment of the stock. At the suggestion of Mr. Laws that the transfer should not be made to both but to Annie Laws alone,

it being understood that she would hold it for her sister and herself, it was drawn to Annie Laws. This assignment was then signed by the name of Ellen Lehane, who made her mark, which was witnessed by Mr. Muller and Harry L. Laws and by Miss Alice Laws, and the paper was left in the hands of defendants' brother.

Miss Alice Laws and Ellen Lehane then returned, walking back to Ellen's home, where Alice left her at the foot of the stairs. Mrs. Phelan seeing her come, assisted her upstairs and, finding her in a state of collapse, put her to bed and gave her stimulants. She was about the house the rest of the week, suffering from a cold, until Saturday, when she consented to have a doctor called. The doctor found her suffering from a rheumatic and bronchial condition, of which she had been complaining for some five or six weeks, and he prescribed for her. She was found dead in bed Sunday morning, November 3. The doctor testified that "the indirect cause of her death was a senile degeneration of all of her organs, that is, her heart and lungs."

Miss Annie Laws, who had called and seen her on Thursday, was notified at once of her death by Mrs. Phelan, and she came and took charge of affairs and made the necessary funeral arrangements, sending for Father Crane, who came on from St. Louis and performed the church services.

Upon the request of Miss Annie Laws Father Crane came to Cincinnati December 2, 1912, and met her and her brother, and was told by them of the transfer to him of the sugar and locomotive stocks, the new certificates for which in his name were then delivered to him. On his inquiry in regard to Procter & Gamble stock there is a conflict of testimony, Father Crane saying that Mr. Laws told him it had been sold by him years ago to invest the money in these stocks, while Mr. Laws testified that he told Father Crane that Ellen had disposed of the stock before her death, without giving him any of the particulars as to how or when she had disposed of it.

The certificate for the twenty-seven shares of Procter & Gamble stock, together with the assignment to Annie Laws, was sent by Harry L. Laws, through his broker, for transfer on Thursday, October 31, 1912, and it was transferred to Annie

Laws. It was sold by her brother for her December 16, 1912, for $190 per share, and the proceeds were placed by Harry L. Laws in an account to the credit of "Alice Laws, Special."

On December 16, 1912, a letter was written by the attorneys of the plaintiffs below to Miss Annie Laws advising her that they had been appointed administrators of Ellen Lehane's estate and asking for information regarding it. She responded with a letter referring them to Father Crane for such information. Thereupon proceedings were had in the probate court for a citation against Annie Laws and Harry Laws to appear and disclose to the court their knowledge concerning the property and effects of Ellen Lehane's estate. Learning, as a result of this citation, of the transfer of this stock, plaintiffs brought this action, which resulted in a verdict and judgment in their favor.

The original petition, setting out but one cause of action, was for the recovery of the value of this stock. While two causes of action were set out in the fourth amended petition, on which the trial was had, it was alleged that the defendants had sold the stock and had appropriated its proceeds to their own use. There could be, therefore, no relief obtained by setting aside the transfer, or seeking to recover the stock itself. It was an action for money, the value of property which defendants claimed had been given to them, but the validity of which gift was denied by plaintiffs upon two grounds: first, because of unsoundness of mind on the part of their intestate; second, because of undue influence on the part of defendants.

It was not necessary to set out two causes of action. The primary demand was for the recovery of money only, as was held by this court in dismissing the appeal sought to be taken from this judgment.

Nor was it improper in the trial court to permit an amendment of the petition during the trial by the elimination of the charge of fraud as a ground of recovery and substituting the charge of undue influence, nor was it error to refuse a continuance because of that amendment. Any possible error because of this amendment is removed by the answers given by the jury to the interrogatories submitted at the request of defendants. By these answers the jury found that at the time of the alleged gift the

decedent was of unsound mind, but that no undue influence had been exercised upon her by the defendants.

The judgment is therefore based upon the finding that decedent was of unsound mind, and many of the errors claimed by defendants in error in regard to the matter of undue influence are thus necessarily eliminated from consideration.

It is contended that the court erred in its general charge, in discussing the issue of unsound mind. Plaintiffs in error insist that decedent must be required to have merely testamentary capacity at the time of the execution of the assignment of this stock in order to perfect it as a valid gift.

It is true that a person may lack capacity for the transaction of ordinary business, and lack contractual capacity, and yet may have testamentary capacity (*Wadsworth* v. *Purdy,* 12 C.C. [N.S.], 8, 12). A less degree of mental capacity is required to make a will than to make a contract or to transact ordinary business involving a contest of reason, judgment, experience and the exercise of mental powers not at all necessary to the testamentary disposition of property (*Rowcliffe* v. *Belse,* 261 Ill., 566, 573). It is, however, doubtful whether mere testamentary capacity would be sufficient to sustain a gift such as is claimed here. A will disposes of property to take effect only after death. It can be revoked at any time by the testator up to the time of his death. But a gift such as this, once made, is irrevocable by the donor alone, without the consent of the donee. It was not made to take effect at death, but was to be operative at once. It would divest Ellen Lehane of all of her property except merely the income of the stock to be given to Father Crane at her death, which also she had reserved no right to sell or recover back. She made no condition to retain the income until death, as to this stock, but simply relied upon a general understanding that the Misses Laws would look after and supply her wants without any definite obligation on their part in return for the gift. While she was old, she had no immediate prospect of death, but might have lived for years. Under these circumstances it would require a contractual rather than testamentary capacity to uphold such a gift.

The part of the charge particularly objected to by plaintiffs in error, in which the court says that

—"the jury would be warranted in finding Ellen Lehane of unsound mind"—

when the purported gift was executed, if she was then

—"so far incapable of acting rationally in the ordinary affairs of life and of comprehending the nature and value of her property as to be incapable of transacting or procuring to be transacted ordinary business, and of reasonably understanding the business or transactions in which she engaged as to the nature, purpose, effect or result, and did not act rationally in the ordinary affairs of life"—

taken in connection with the finding of the jury that she was then of unsound mind, would indicate a greater degree of incapacity found by the jury than was deemed necessary by plaintiffs in error to invalidate the gift.

While the charge may be subject to criticism as to certain independent paragraphs when taken alone, taken as a whole, as it must be, we find it without error prejudicial to plaintiffs in error. And the court did not err in refusing to separately charge the jury, when so requested by plaintiffs in error, that the issue of fraud was not in the case, the jury having then been distinctly charged to "only regard the issues made by the pleadings, which are unsoundness of mind and undue influence."

A reading of the argument, in full, as made to the jury by Mr. Horstman, on which plaintiffs in error predicate a claim of misconduct of counsel, fails to show that the bounds of legitimate argument have been so far exceeded as to create error to their prejudice.

A careful consideration of the voluminous record and of the extended arguments and briefs of counsel, fails to disclose that the judgment is not sustained by the evidence, or that prejudicial error has intervened, but shows that substantial justice has been done.

The judgment is affirmed.

JONES (E. H.), P. J., and GORMAN, J., concur.