[Civ. No. 3763.   First Appellate District, Division One.—February 9, 1921.]

In the Matter of the Estate of ANNIE O'CONNOR, Deceased.   JAMES B. HOLOHAN et al., Respondents, v. MAUD McADAM et al., Appellants.

[1] ESTATES OF DECEASED PERSONS—ORDER DENYING PROBATE OF WILL —MENTAL UNSOUNDNESS — CONFLICT OF EVIDENCE — APPEAL. — A judgment refusing to admit a purported will to probate will not be reversed where based upon a verdict reached upon conflicting testimony that the testatrix at the time of its execution was of unsound mind and no substantial errors occurred at the trial.

[2] ID.—EVIDENCE—MENTAL CONDITION PRIOR AND SUBSEQUENT TO ALLEGED TESTAMENTARY ACT.—In a contest to the probate of a will on the ground of mental unsoundness, evidence tending to show the condition of the mind of the testatrix before and after the date of the alleged testamentary act is relevant as bearing upon the mental condition at the time of execution, and such evidence is entitled to such weight as the jury considers it deserves.

APPEAL from a judgment of the Superior Court of Santa Cruz County.   Benj. K. Knight, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Rea, Cassin & Caldwell for Appellants.

John W. Preston, Chas. B. Younger and Robert Duncan for Respondents.

WASTE, P. J.—This is an appeal by the proponents from a judgment of the lower court refusing to admit to probate a document dated April 25, 1919, purporting to be the last will and testament of Annie O'Connor, deceased. The contest was tried before a jury, which found that while the purported will was not procured through the undue influence of certain of the proponents, as charged by the contestants, Annie O'Connor was not of sound and disposing mind at the time the document was signed by her.   This appeal presents the question of the sufficiency of the evidence to support the verdict of unsoundness of mind.

In the lower court, the contestants, who are the respondents here, offered evidence tending to support their con-

tention that Annie O'Connor, by reason of an advanced state of arteriosclerosis, produced by various causes, had been for several months prior to April 21, 1919, seriously impaired mentally. On that day she suffered a severe stroke of paralysis, producing a state of coma, which, the respondents contend, lasted until Mrs. O'Connor's death, and resulted in a condition of complete incompetency, which prevented any normal action on the part of the testatrix during that entire period. The proceedings had and the testimony taken at the trial are presented in a voluminous record. It will be impossible for us to do more than briefly summarize portions of the evidence relied upon by the respective parties to sustain their opposing contentions, and which, in our opinion, not only presents a conflict of testimony, but strongly preponderates in favor of the contestants.

The document which was refused probate was dated the twenty-fifth day of April, 1919, four days after Annie O'Connor suffered a cerebral hemorrhage, from which she died at her home in Watsonville, Santa Cruz County, on the second day of July, following. She was then in her sixty-eighth year. Some four years before the testatrix had executed a will by the terms of which she devised to James B. Holohan fourteen thousand dollars; to Alice Holohan Kelly the sum of five thousand dollars; to Mrs. Mary Jackson, an elderly lady who lived with her, eight hundred dollars; to Margaret Nash eight hundred dollars; to Frances and Gertrude Zills her house and lot in Watsonville; to her cousins, sons and daughters of her uncle, Thomas Pearson, of East 27th Street, New York City, ten thousand dollars; to the Pajaro Valley Orphan Asylum five hundred dollars, and to the superior of the Valley Church, Watsonville, five hundred dollars for masses for herself and family. She named H. S. Fletcher as executor of this will. These provisions appear to have been dictated by the mandates of affection and justice. The relations between the testatrix and the legatees named in the will of 1915 appear to have continued after its execution just as in the past. In the document of April, 1919, offered for probate by the proponents, a number of changes were made. Some of the former legacies were omitted entirely. Others were enlarged or decreased. New devises and bequests were inserted. We do not think it material to our consideration of the appeal

to dwell at length on the situation in which Mrs. O'Connor was placed in the last months of her life, or the circumstances under which the purported will was executed. The issues of unsoundness of mind and of undue influence were submitted to the jury with an offer on the part of the contestants that if the jury reached a verdict of unsoundness of mind, the second issue could be answered in the negative. That was done. As we think the evidence amply supports the finding of the jury that Mrs. O'Connor was of unsound mind at the time of the making of the second will, any reference to changes in the terms of the two wills, or the circumstances of the execution of the questioned instrument, will be only incidental to our consideration of the question presented by this appeal.

Dr. Koepke, who had been Mrs. O'Connor's personal physician for several years preceding her death, testified that during that time she was variously afflicted, having, as the doctor described it, "a complication of troubles which continued all the time." When her physician first treated her in 1912 she complained of a heart lesion, or "leaky heart," resulting from an insufficiency of the mitral valve. There was a perceptible arteriosclerosis or hardening of the arteries, which progressed to the time of Mrs. O'Connor's death. The doctor discovered that she was permanently subject to Bright's disease, and suffered from an incontinence of urine. Feeling unable to relieve his patient, Dr. Koepke ceased visiting her in February, 1919. On April 21st, following, Mrs. O'Connor suffered a cerebral hemorrhage caused by the bursting of a blood vessel in the brain. Dr. Koepke was at once called, and for the next two months saw her almost daily. She was unable during that time to use her left arm and limb, and there was a marked drawing of one side of her face. After the stroke the patient had no power of control of her bowels, and bladder, and their natural functions. From that time also, so far as the doctor observed, she did not initiate conversation on any subject. She paid little or no attention to anything, merely lying quietly and answering "Yes" to any questions asked her. The doctor testified that from the 21st of April, 1919, the day on which Mrs. O'Connor was stricken by the cerebral hemorrhage, until the time he ceased to treat her, on June 25th, following, her condition did not vary, and he gave

as his opinion that Mrs. O'Connor was not of sound mind during that time. He was very firm also in his opinion that she could not have appreciated, known, or understood the contents, or the full import and meaning, of the document she signed.

There is other testimony that, following the stroke of paralysis, Mrs. O'Connor's condition remained almost unchanged; that from that time until her death, two months later, she was irrational, took no interest in any affairs, did not talk, and did not recognize friends whom she had known for many years. This condition, the witness testified, gradually grew worse. Mrs. Kate West, the nurse who took care of the old lady during a part of this period, testified, by deposition, that the patient's mouth was drawn to one side. Sometimes Mrs. O'Connor did not know where she was. She talked very thick, did not articulate well, and could not carry on a connected conversation. Frequently the nurse had to stop the patient from tearing the quilts to pieces. At times, also, Mrs. O'Connor seemed to be trying to sew without a needle. Mrs. Margaret Fahey, an entirely disinterested witness, was called on behalf of the proponents. She had known the deceased for fifteen years. She testified that upon the occasion of a visit she made to Mrs. O'Connor, after the stroke, the old lady did not know her, and the witness had to tell her her name. She appeared dazed and "stared off into space" when the witness attempted to engage her in conversation. In her opinion, Mrs. O'Connor was not of sound mind at that time. Mr. F. A. Kilburn was one of the subscribing witnesses to the will. He was called by the proponents. He testified that Mrs. O'Connor did not initiate any conversation while he was in the house and answered all questions by "Yes" or "No." He made no test of her mentality. He went there to see her sign her name, which she did "rationally." After having testified that, in his opinion, Mrs. O'Connor was "capable" at the time she signed her name to the document, on cross-examination he "was not prepared to say that she was of sound mind at that time."

Mrs. Mary Atteridge, who had known Annie O'Connor for about forty years, visited her on the day, and just prior to the time, the purported will was signed. At that time the old lady was tearing at the quilts on the bed; she did

not speak to the witness, and made no reply to the questions she asked. In Mrs. Atteridge's opinion, the old lady was not of sound mind at that time, and was in the same mental condition when next visited by her, in May, following. Mary Jackson, a friend of the deceased for thirty-seven years, lived in the same house with and assisted Mrs. O'Connor for the eight or nine years preceding the latter's death. Even prior to the stroke, according to this witness, Mrs. O'Connor's mind was failing continually. By the terms of the first will she was left eight hundred dollars. In the document of 1919 she was given one thousand dollars, but she was greatly incensed at the circumstances attending the execution of the latter document at a time when, as she testified, "Mrs. O'Connor could do no business at all," and "when she wasn't of sound mind." She at once reported the occurrence to Mrs. O'Connor's confidential agent and adviser, Mr. Fletcher. Mrs. Momand, next door neighbor and old friend, testified that Mrs. O'Connor was acting irrationally before the final stroke. Two days after the hemorrhage she visited the sick room. In her opinion, at that time, the deceased was of unsound mind. She did not recognize the witness and did not remember the visit of friends who had been with her the night before. The symptoms described by this witness continued until Mrs. O'Connor's death. Reverend Wm. J. Clancy, the assistant pastor of the church in which the deceased had her membership, saw her a number of times before and after the stroke. He anointed her according to the rites of the church, in preparation for death, a ceremony which the decedent did not, in his opinion, appreciate. Before the hemorrhage, according to Father Clancy, the decedent's memory had almost completely gone and she was not normal mentally. She remained passively in this condition until she died.

There is much more evidence to the same effect. Edward E. Kelly, husband of one of the contestants, an old acquaintance, attended to the payment of Mrs. O'Connor's monthly bills for her for several years prior to her death. He testified that during the latter months of her life her mind was failing. About two weeks before the stroke he found her on the street in a dazed condition and unable to recognize him or to appreciate what he said to her. He found her in a stupor on the morning of the stroke and visited her some fifteen times before she died. In his opinion she was

"out of her mind" during the time. Elizabeth Holohan, George W. Holohan, Stasia Speckens, Louise Schroeder, and Carrie Burke testified, the effect of their evidence being that before the stroke Mrs. O'Connor's mind was failing and she was at times irrational, a condition which was aggravated by and gradually grew worse after that occurrence.

The contestants who testified in their own behalf were: James B. Holohan, who seems to have stood in almost the relationship of a son to Mrs. O'Connor, and who was one of the principal legatees under the will of 1915, but who was omitted entirely from the 1919 instrument; H. S. Fletcher, for many years the confidential business agent of Mrs. O'Connor; Alice Holohan Kelly, Frances Zills, and Gertrude Zills, all close and intimate friends of Mrs. O'Connor, and for whom she entertained the warmest personal regard. All of these witnesses testified to facts tending to show that Mrs. O'Connor was irrational, and of lapsing memory prior to the stroke, and of unsound mind thereafter. In their opinion, after April 21, 1919, her mental condition was such that she was incapable of doing any business.

The force and effect of the foregoing testimony is assailed by the appellants. They depend upon an analysis of portions of the evidence favorable to themselves, and the assertion that upon cross-examination statements were elicited from some of the witnesses at variance with their more direct testimony. But the fact remains that the witnesses testified as we have briefly narrated. On the other hand, there is evidence on the part of the proponents, the effect of which is directly to the contrary from that adduced by the contestants. It would serve no useful purpose to present as long a *résumé* of this testimony as we have done in discussing the case of the contestants, for the result would be merely to emphasize the direct conflict, the burden of resolving which in favor of one side or the other rested upon the jury. There is evidence which, if it had been accepted by the jury, will be sufficient to support a verdict upholding the validity of the will. For instance, the attorney who drew the will testified that when he visited Mrs. O'Connor on the morning of April 21st, she was weaker than normal and spoke in a rather low voice, but expressed herself plainly on what she wanted. She gave him instructions relative to making a will, which he jotted down and took

to his office, where he prepared the document in question. He then took it back to Mrs. O'Connor's home, where she signed it in the presence of himself, Dr. Koepke, and Mr. Kilburn. She was, in his judgment, at that time of sound mind. When Miss Helen Phelan, an old friend of Mrs. O'Connor, called on the 7th or 8th of May, she had a conversation with the deceased, at which time she appeared rational. Reverend Florian Zettel, the Catholic priest who received one thousand dollars under the will of April 25th, Caroline McAdam, Maud McAdam, each a legatee under the will, and Ida McAdam testified to conversations and actions of the decedent, before and after the final stroke, to show her competency. The weight to be given their testimony, and whether or not its effect had been destroyed on cross-examination, or overcome by the evidence on the other side, were all matters for the jury, as in the case of the witnesses for the contestants. The testimony of Dr. Koepke and Mr. Kilburn, the other subscribing witness to the will, has already been alluded to. The effect of the direct examination of Mrs. West and Mrs. Gay, nurses who cared for Mrs. O'Connor after April 21st, to the effect that the deceased at times possessed sufficient mentality to execute a will, was somewhat destroyed by the evidence of Laura Falkenberg, another nurse, who was also a witness for the proponents. She testified that during the time she was with the patient she was "absolutely without mentality."

[1] From the foregoing it is at once apparent that the jury reached its verdict that, at the time of the execution of the ·purported will, on April 25, 1919, Mrs. O'Connor was of unsound mind, on sharply conflicting testimony. In the absence of substantial error or law occurring at the trial, and none is claimed here. by the appellants, a judgment based upon such a verdict will not be reversed. (*Estate of Ross*, 179 Cal. 629, 632, [178 Pac. 510].) Appellants attempted to discredit the evidence of Dr. Koepke, who testified that when Mrs. O'Connor signed the purported will, on April 25th, she was not mentally able to comprehend or understand its contents, and thus claim that Mr. Wyckoff's positive testimony, and the less satisfactory evidence of Mr. Kilburn, stand uncontradicted. But the jury, apparently, did not think Dr. Koepke discredited or his testimony unworthy of credence. Even had it done so, we

would still be unable to set aside their verdict on the grounds advanced by appellants. [2] Much evidence was admitted on both sides to show the condition of Mrs. O'Connor's mind before and after the date of her testamentary act. Such evidence was relevant and important for its bearing upon the condition of her mind when the will was executed. (*Estate of Wilson,* 117 Cal. 262, 276, [49 Pac. 172, 711]; *Estate of Purcell,* 164 Cal. 300, [128 Pac. 932].) This evidence was entitled to such weight and consideration as the jury thought it deserved. (*Dunphy* v. *Dunphy,* 161 Cal. 380–385, [Ann. Cas. 1913B, 1230, 38 L. R. A. (N. S.) 818, 119 Pac. 512].) It tended, on the part of the contestants, to show that Mrs. O'Connor was afflicted with a gradually increasing unsoundness of mind, which became complete after the cerebral stroke, and which was always manifest and ever present, affecting her mental capacity, particularly in the months preceding and during her last illness, when she made the questioned will. Other evidence, mostly that in behalf of the proponents, tended to show that her incompetency was of a form that manifested itself by frequent attacks, with lucid intervals in between. With the testimony of Dr. Koepke disposed of, as appellants would have us hold, they insist that the only evidence relating to Mrs. O'Connor's condition when she was actually signing her will was to the effect that she was then in a lucid interval. But from this entire evidence the jury could have concluded either that Mrs. O'Connor had no testamentary capacity during her last illness, or that the will was not executed during a lucid interval of her mind. In this condition of the case upon the testimony the decision of the jury cannot be disturbed upon the ground that it is contrary to the evidence. (*Estate of Jones,* 166 Cal. 108–110, [135 Pac. 288]; *Estate of Martin,* 170 Cal. 657–663, [151 Pac. 138].)

The judgment is affirmed.

Richards, J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 7, 1921.

All the Justices concurred, except Sloane, J., who was absent.