[Civ. No. 4760. First Appellate District, Division One.—September 26, 1924.]

In the Matter of the Estate of WILLIAM GEORGE BARR, Deceased. MABEL W. BARR, Appellant; GEORGE R. STILES, Respondent.

[1] WILLS—CONTEST TO PROBATE — MENTAL INCOMPETENCY — BURDEN OF PROOF.—In a contest to the probate of a will on the ground of unsoundness of mind of the testator, it devolved upon the contestant to prove the incompetency of the testator; to prove incompetency at the very moment of the execution of the will; to prove that the will upon its face was not a rational act, that it was not made during a lucid interval, and that the delusion of the testator controlled his volition in its execution.

[2] ID.—MENTAL INCOMPETENCY—FINDING—APPEAL—EVIDENCE—PROVINCE OF TRIAL COURT.—In considering on appeal the insufficiency of the evidence to support the finding of the trial court as to the mental incompetency of a testator ·to make a will, the rule obtains that the trial court was warranted in believing as true all of the evidence in support of the contestant's claims (unless it was inherently so improbable as to be entirely unworthy of belief) and in disregarding as untrue all of the evidence in behalf of the proponent which was in any way contradicted or otherwise impeached; and it is the duty of the appellate court, in reviewing the facts, to interpret the evidence so as to support the finding of the trial court, to the extent that it is reasonably susceptible thereto in the light of such rule.

[3] ID.—WEIGHT OF EVIDENCE—CREDIBILITY OF WITNESSES—FINDINGS —APPEAL.—In will contests the rule is the same as in other proceedings, that all questions of the weight of the evidence and the credibility of the witnesses are for the trial court, and if there be

1. See 28 R. C. L. 398.

2. See 2 Cal. Jur. 867, 877, 879; 2 R. C. L. 222.

3. Credibility of witnesses, note, 86 Am. Dec. 328. See, also, 10 Cal. Jur. 1167; 10 R. C. L. 1004; 28 R. C. L. 657.

any substantial evidence to support the finding it cannot be set aside by the reviewing court, although said court might believe the great preponderance of the evidence was the other way.

[4] ID.—CONFLICTING EVIDENCE—DUTY OF TRIAL COURT.—In a will contest, where the evidence is conflicting on the question whether the testator was mentally competent to make a will at the time of its execution, the question is one to be determined by the trial court.

[5] ID.—EVIDENCE — MENTAL CONDITION PRIOR AND SUBSEQUENT TO TESTAMENTARY ACT.—In a contest to the probate of a will on the ground of unsoundness of mind, evidence showing the condition of the testator's mind before and after the date of his testamentary act is relevant and important as bearing upon the condition of his mind when the will was executed, and such evidence is entitled to such weight and consideration as the trial court thinks it deserves.

[6] ID. — MENTAL INCOMPETENCY — FINDING — EVIDENCE — APPEAL. — In such a contest, where from the entire evidence the trial court could have concluded either that the testator had no testamentary capacity during the period beginning with his commitment for insanity and ending with his death or that the will was not executed during a lucid interval of his mind, the decision of the trial court that the testator was mentally incompetent to make the will cannot be disturbed on appeal upon the ground that it was contrary to the evidence.

(1) 40 Cyc., pp. 1020, 1021, 1028. (2) 38 Cyc., p. 1945; 40 Cyc., p. 1358. (3) 38 Cyc., p. 1945. (4) 40 Cyc., p. 1358. (5) 40 Cyc., p. 1028. (6) 40 Cyc., p. 1358.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. James M. Troutt, Judge. Affirmed.

The facts are stated in the opinion of the court.

Byron Coleman for Appellant.

J. J. Dunne and James Walter Scott for Respondent.

4. See 2 Cal. Jur. 921; 10 Cal. Jur. 1171, 1172; 2 R. C. L. 204.
5. Time to which inquiry as to testamentary capacity should be limited, note, 18 Ann. Cas. 905. See, also, 28 R. C. L. 93.
6. What constitutes capacity to make will, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444. See, also, 28 R. C. L. 86.

ST. SURE, J.—William G. Barr, an adjudged insane person, died on May 27, 1916, while an inmate of the state hospital for the insane at Agnews, leaving an estate valued at approximately twelve thousand dollars. Mabel W. Barr, his wife, survived him as his only heir. In due time Mrs. Barr offered for probate a document in words and figures as follows:

"Belmont, Sept. 6, 1914.

"I, William G. Barr being of sound mind, and in every way well physically and mentally, do leave all I possess to my wife Mabel W. Barr—hereby revoking former wills if any.

"Wm. G. Barr."

In her petition Mrs. Barr alleged the usual jurisdictional facts, and that the aforesaid instrument was entirely written, dated, and signed by the hand of said William G. Barr and is his last will and testament.

Thereafter George R. Stiles filed his opposition to the probate of said instrument wherein his interest and his ground of contest are alleged as follows: "that he is the sole legatee and devisee of said William George Barr, deceased, under the terms and provisions of an holographic will executed by said William George Barr, deceased, on the 5th day of November, 1912; that said will so executed on said fifth day of November, 1912, is the last will and testament of said William George Barr, deceased; that at the time of the execution of the said will dated November 5th, 1912, said William George Barr was of sound and disposing mind, and not acting under menace, fraud, duress or undue influence of any kind, but that said last named will is a valid one, and is, as this contestant alleges entitled to be admitted to probate as the last will and testament of said deceased; that the alleged will and testament bearing date September 6th, 1914, ought not to be admitted to probate as the last will and testament of said William G. Barr for the reasons hereafter set forth.

"1. That said paper writing is not the last will and testament of said decedent in that said William G. Barr was insane, incompetent and of unsound mind at the time of the execution of said paper writing, and was by reason thereof not competent to make a will;

"2. That the said William G. Barr was not of sound and disposing mind on the 6th day of September, 1914, the date of the alleged execution of said will; that on the contrary he was at said time of unsound mind and insane, and was confined to and an inmate of an asylum for the insane at Belmont, California;

"3. That the said decedent was not at the time of the alleged execution of said paper writing, dated September 6th, 1914, competent to make and publish a will, or to make any testamentary disposition whatever of his property."

Mabel W. Barr, proponent, made answer by a general denial. The cause on the issues thus made was tried by the court sitting without a jury. The trial court found that on September 6, 1914, and at the time of the purported execution of aforesaid written instrument that Mr. Barr was insane, incompetent, of unsound mind, and not competent to make a will. From its findings the trial court concluded that aforesaid written instrument was not the last will and testament of William G. Barr, sustained the opposition and denied probate. Judgment was entered accordingly. Proponent moved for a new trial upon the ground of the insufficiency of the evidence to justify the decision, and that the decision was against law. Motion for new trial was denied and proponent appeals from the judgment.

Substantially the facts are these: The time and place of decedent's birth are unknown. The first knowledge of him, he was an inmate of a San Francisco foundling asylum, and of the age of two years. Nothing is known of the characteristics, environment, or mode of life of his immediate progenitors or family. He was an abandoned child. When he was eight years of age he was legally adopted by a resident of San Francisco. He had resided with his adopter since he was two years old. He received schooling at a grammar and high school. He obtained employment in the office of an insurance company and accumulated sufficient money to enable him to attend a preparatory school in Massachusetts. He entered Harvard University, where he obtained his academic degree. While at Harvard he devoted about one year to the study of law. Returning to San Francisco from Harvard he entered Hastings College of the Law, from which he received his professional degree. He was admitted

to the bar, opened an office in San Francisco for the practice of the law, yet he never actively engaged in practice, but devoted his attention to real estate, oil, and accounting matters.

During the earlier period of his life decedent held a responsible position with a life insurance company. He is described as a friendly, genial, pleasant, sociable man; interested in general current topics. He did not use vulgar, obscene, and scurrilous language, and his method of expressing himself was always that of a gentleman. He took much pleasure in innocent social enjoyment; he liked cards, dancing, dinner, and house parties. He was very bright; not taciturn. He was not suspicious of others, nor subject to delusions or eccentricities of any kind.

In January, 1907, decedent became a lodger in the home of Mr. George Wilbur in San Francisco, where he met Mabel W. Wilbur, whom he subsequently married. Decedent was then in his thirty-third year. A warm friendship between the deceased and the members of the Wilbur household was soon established. He lived at the Wilbur home until March, 1910, when he went to Seattle. A month later Mabel Wilbur joined decedent at Portland, where they were married. They then left Portland and went to Seattle, where they resided for about four months. At the end of this period the wife returned alone to the home of her parents in San Francisco and decedent went alone to Chicago, where he remained for about two months. Later, in October, 1910, decedent and his wife met in Los Angeles. They remained in Los Angeles one week and then removed to San Diego, where they remained about four months. While they resided in San Diego Mrs. Barr left San Diego and returned to San Francisco; later she joined her husband at Long Beach, and remained there for one or two weeks, until in June, 1911, they finally separated. The total period of time which elapsed between their marriage and separation was fourteen months; the total time of actual matrimonial cohabitation was eight months; and during the entire period between the marriage and the separation decedent never entered the home of his wife's parents—never, in fact, entered San Francisco. After the marriage the decedent indulged in the use of intoxicating liquor nearly every day;

and this use of liquor by him was made the ground of divorce proceedings by her against him. After their final separation in June, 1911, there was some correspondence between the parties, and for about nine months the deceased sent his wife about forty dollars monthly; he offered her a settlement of two thousand dollars, which she refused, telling him that if she could not live with him she could not take his money. On May 2, 1912, proponent commenced an action for divorce on the ground of habitual intemperance, and on June 20, 1912, an interlocutory decree, on that ground, was granted. Final decree of divorce was never applied for nor was the suit dismissed.

With the commencement of the action for divorce all correspondence between the parties ceased. Proponent did .not communicate with the deceased nor did he with her. It was while this state of total estrangement was maintained that deceased wrote the document which gives George R. Stiles his standing as contestant. This document is dated November 5, 1912. At the time of his marriage decedent was possessed of a considerable sum of money, wholly acquired independently of any assistance from his wife.

In December, 1912, decedent was arrested in Oregon as an insane person. He was judicially determined to be an insane person with fixed delusions, and as such insane person was committed to the state insane asylum at Salem, Oregon. Thereafter, on January 8, 1913, his wife was informed that her husband was mentally deranged and that he was an inmate of the Salem insane asylum. A short time after receiving this information she left San Francisco for Salem, accompanied by a male nurse. On reaching Salem, such proceedings were had that the authorities at the insane asylum delivered decedent to her and the male nurse to be by them brought back to California. As she was about to leave Salem she telegraphed to San Francisco as follows: ''Bill [referring to decedent] fine; no trouble at all; leave for home tonight.'' It was at this time that she asked him if he wanted to go home; his reply was that he wanted to get out of that place (Salem). She observed that he was changed in the respect that he was more quiet than he was formerly. He was paler and thinner. ''He was pale, of course, and well, I won't say melancholy, but he was not

jovial like he was formerly; he was quiet.'' The parties boarded the train for San Francisco, and the berth occupied by decedent was the last berth in the last car of the train. When the train reached Benicia in the early hours of the morning, while the train was being ferried across Carquinez Straits, decedent disappeared from the train. A search for him proved unavailing. Later he telephoned from Oakland to San Francisco, and the next day he appeared in a law office in San Francisco. Here he was left temporarily in charge of a young man who was unable to detain him, and later on he made his appearance on the ferry-boat that plies between Sausalito and San Francisco. While the boat was passing from San Francisco to Sausalito he dove overboard for no other apparent purpose than to commit suicide; but he was rescued, brought to Sausalito, and turned over to the authorities there. News of the Sausalito boat experience reached friends in San Francisco and one of them went to Sausalito, took decedent in charge and brought him to San Francisco. On the way he complained of being pursued by other persons, and of being annoyed by electrical devices, and when the steamer reached San Francisco he wished to go along the waterfront for the purpose of doing away with himself. He was dissuaded from doing this and placed in Greer's sanitarium, which received mentally deranged patients. He was here placed in a room with barred windows; he continued in his belief that he was being pursued, and claimed that the electrical devices which harassed him were already installed on the walls of the room in which he was confined, but there was no foundation for these beliefs whatever. While here he was visited by certain friends, including Mrs. Barr, who tried to engage him in conversation; he was rather uncommunicative; he was rather mute and morose; for a long time he would not answer any questions; he claimed electrical appliances or dictaphones had been installed where he lived, and that people had been persecuting him; he heard voices at night; he was set in his delusions; his friends tried to argue him out of his delusions, but unsuccessfully. He was taciturn; when his friends managed to get him to talk he would say only a few words. He was extremely suspicious.

After a time he was removed to a sanitarium for mental cases at Belmont, near San Francisco, where he remained for about ten days. During this period Mrs. Barr filed a verified petition with the superior court in San Francisco for the appointment of herself as his guardian, and stated therein that by reason of certain mental afflictions her husband was mentally incompetent to manage his property or to care for himself. Two other similar petitions were filed, one by the master of his Masonic lodge and the other by a local trust company, each of which set forth the mental derangement of decedent and prayed for the appointment of a guardian for him. These guardianship proceedings were heard by the late Judge Coffey. Decedent was on the stand for half an hour and one of the attorneys present at the hearing testified that decedent apeared quite rational, and it was upon his request that the court appointed as guardian Mr. Ferguson, the master of the lodge. While at Belmont on this first occasion decedent persisted in his beliefs as to the pursuers and as to the electrical devices.

After the appointment of a guardian, decedent was removed from Belmont to Thompson's sanitarium for mental cases in San Francisco, en route to Clark's sanitarium for mental cases at Stockton. He remained only one night at Thompson's on this occasion. When he was being taken from Belmont to Thompson's, he was so taken in a taxicab by his guardian, accompanied by a deputy sheriff. While on the way to Thompson's he refused to speak either to his guardian or to the deputy sheriff, except to exclaim: "For God's sake, keep those people away from me"; and he would look through the window in the back of the taxicab and say, "Ain't they awful?" and want to get out of the cab and chase the people away. The people that he referred to were imaginary; there were no people there. He remained at Thompson's that night, and upon the following day was taken to Clark's sanitarium by way of the ferry to Oakland, and by train from Oakland to Stockton. He was so taken by his guardian and the deputy sheriff. On arrival at the ferry decedent declared that people were still following him, and requested his guardian to prevent them from going aboard the ferry-boat; and to humor him the guardian went to a policeman near by, and after a few words with him

returned to the decedent and told him that none of the pur-
suers would be allowed upon the boat. A similar occurrence
took place at the train, and the guardian spoke to the con-
ductor as he had done to the policeman at the ferry, and
then reported to decedent that none of those who followed
him would be allowed on board the train. When he finally
got on board the train he kept looking behind him, and
insisted upon riding in the last seat of the car, so as to keep
people away from behind him; and even then he would
look around and repeat the same thing, "Isn't that awful;
isn't that awful; chase these people away." While on this
trip he would occasionally attempt to strike the deputy
sheriff, who had to sit close to him so as to ward off the
blows; and occasionally he would say that he had a notion
to knock off the deputy sheriff's head and attempt to strike
him. Decedent remained at Clark's sanitarium from April
to September, 1913. While there he was subject to aural
hallucinations; he believed that people were defaming his
character by speaking ill of him; he believed that the sani-
tarium authorities poisoned his food, refused to eat, and
had to be fed by a tube; he believed that people were fol-
lowing him; he often talked to himself. There was no foun-
dation whatever for his beliefs or imaginings, or any of
them. During his stay at Clark's he attacked the superin-
tendent without provocation; and when taken for a ride by
his guardian he maintained a listless and indifferent atti-
tude toward his surroundings. In September, 1913, he was
removed from Clark's to Thompson's sanitarium in San
Francisco, and here he remained until near the end of June,
1914. In this removal the guardian was assisted by the
same deputy sheriff who had assisted on former occasions;
this removal was similar to the others; decedent made re-
peated requests to keep the people away from behind him;
he insisted on sitting in the last seat in the last car; he
wanted to stand out on the platform on the last car, but the
deputy sheriff would not allow this, and he exhibited the same
tendency toward violence, and would make a move to strike
occasionally. On the evening of his arrival at Thompson's
he attacked the proprietor, who required assistance to quiet
him. After this he was confined in a room in this sanita-
rium, the windows of which were covered with wire screen-

ing, and at times he became so violent that it was necessary to strap his wrists and at other times so violent that it became necessary to chain him to his bed.

During this time he was not allowed to use any utensils which might be the means of an offensive attack by him; he was allowed to use no knife; the utensils from which he ate were made of tin or agateware; when visitors would come to see him an attendant would remain close by his room; and upon occasions his food would be brought to him by a male attendant rather than by a female attendant. During this same period of time decedent frequently and in a loud tone of voice insisted on engaging in a prize-fight with some person or persons connected with the sanitarium; he stated that his purpose in having such a prize-fight was to establish his right to be released from the restraint of the sanitarium. During this period he suffered delusions of persecution and pursuit; and he entertained the belief that by taking a ride in an automobile he could escape from this persecution and pursuit. He suffered from further delusions; for example, he believed that whenever he had occasion to visit the toilet or the bathroom, the women in the house would congregate about the door and listen to what went on inside; that thoughts were transmitted from distant rooms through the intervening walls into his brain; that electric devices were established in the house for the purpose of causing him seminal emissions, and also for the further purpose of recording his thoughts and prying into his private life; and there was in the house, in the adjoining room to his, a crazy woman who operated an electric device which he described as an "electric blazer," for the purpose of producing a seminal emission by him; that he was caused great annoyance by an instrument which he stated to be a reverberator, but without describing the characteristics of such instrument; he further believed that his guardian was robbing him of his estate, permitting embezzlement and misappropriation of its funds, and violating the postal laws of the United States by suppressing his mail. He further entertained the belief that if he could procure a woman's rubber bathing cap he could use it as an insulator to prevent the strong currents which were being played upon his brain; he entertained the belief that the sanitarium was

frequented by a person or persons whom he described as "German Catholic Jew" and "Masonic Catholic Jew" and "Masonic Catholic Jew Doctor." He attributed much of his alleged annoyance to the persecutions of a certain family named Preston. He claimed that at the time when a guardian was appointed over him there was in the corridor adjacent to the courtroom a boy who controlled his mentality. He entertained the belief that his delusions would vanish overnight; and he believed that he had a property interest in the premises known as 2027 Vallejo Street, in San Francisco. None of these things had any foundation in fact. While in this sanitarium decedent was constantly complaining; he complained of his food and of the straps that were put upon him, and of being chained to his bed, and of his lack of stationery and stamps, of the suppression of his telephone messages, of the failure of his letters to be mailed, and of other matters; and his letters written at this time were replete with unfounded complaints and accusations of various kinds. He became a prolific letter writer.

While at Thompson's Mrs. Barr sought the aid of a member of the bar to release decedent from the restraint that he was under and restore him to capacity; the decedent continually complained of this restraint and was anxious to be freed from it and restored to capacity; the member of the bar in May, 1914, visited decedent at Thompson's and had quite an interview with him; and the result of this interview was that no steps were then, or ever thereafter, taken to procure the release and restoration so much desired by the decedent.

About the end of June, 1914, decedent was removed to the same sanitarium at Belmont of which he had formerly been an inmate. While here on this occasion no change occurred in his mental condition—it remained the same as it had been at Thompson's; his delusions persisted; his tendency to violence continued to be exhibited in his attacks upon others. He attacked the physician, the superintendent and the engineer of the sanitarium.

It was while he was at Belmont on this second occasion that he wrote the paper which is here propounded as his last will, but the validity of which is disputed. He had no expectation of a speedy death; on the contrary, he looked

forward to a long life. He wrote at least four papers intended as wills. The first of these was written by him in the month of November, 1912, subsequent to the obtaining of the interlocutory decree of divorce by his wife, and prior to his arrest in Oregon as an insane person; and by this will he bequeathed all of which he was possessed to contestant. All of the remaining papers, apparently intended as wills, were written after he had been, as an insane person, committed to the insane asylum at Salem. Thus, while he was an inmate of Clark's sanitarium at Stockton, he wrote upon the same day two papers substantially identical in form, whereby he bequeathed all that he had to his wife. He was unable to remember what he had done with these papers; he believed that he had only made one of them; he believed that he had delivered that one to his wife; but, as matter of fact, he had not only written the two, but he had not delivered either to his wife; and the two papers were found in a bundle of other papers in a suitcase after his death. Later on, and while he was an inmate of the sanitarium at Belmont on this second occasion, and on the sixth day of September, 1914, he wrote the paper which is in dispute in this cause. The last-mentioned paper was written under the following circumstances: Mrs. Barr had been visiting her husband from time to time at Belmont. At the trial she, as well as her sister, Mrs. Cora W. Moore, testified that at the time the purported will was executed decedent was perfectly sane. Quoting from the transcript of testimony on cross-examination of Mrs. Barr:

"The Court: Q. What are your reasons for saying that at the time your husband wrote this will with his own hand in September, 1914, he was of sound and disposing mind?

"A. I really believe it.

"The Court: Q. Why should you believe it? Did you have conversation with him?

"A. I had long conversations with him, he was perfectly rational.

"The Court: Yet he had been ill for some time?

"A. Yes.

"Q. Did he have much to say at the time he executed that will?

"A. Yes, he had quite a lot to say about it.

"The Court: Was anything said about the nature and value of his property?

"A. No. He told me he wanted to fix his property, and I told him he would have to hurry and get well so he could put his affairs in order, and he said he could do that now, and he took a piece of paper out of his pocket and wrote this will and handed it to me, and asked me to keep it and I asked him if it was all right, and he said yes.

"Q. Was anyone present besides yourself?

"A. No.

"Q. Did he mention the banks at all during the conversation?

"A. No, but he knew how much he had.

"Q. How do you know? Did he speak of it?

"A. Yes.

"Q. On that day?

"A. No. He often mentioned how much money he had. He knew everything he had. He showed intelligence about his affairs.

"Counsel for Contestant: Mrs. Barr, you said at the time that this paper was written, Mr. Barr was perfectly sane. For how long a period of time before and after the writing of this paper was Mr. Barr perfectly sane?

"A. In my opinion every time I saw him up to the very week of his death he had intelligence enough to know me, and knew who I was, and knew about his property.

"The Court: You considered him a sane man at the time he made the will?

"A. I did.

"Q. What was his condition of mind in that respect? How long was he in that condition of mind before he made the will and after, in your opinion?

"A. In my opinion, as long as he was sick he was always capable of making a will.

"Q. For how long a period of time before he made this paper was he capable of managing his own property?

"A. He was always capable of managing his own property.

"Counsel for Contestant: Q. You say you were alone at the time he wrote this paper?

"A. Yes.

"Q. You and he were sitting in the garden?

"A. Yes.

"Q. How long had you been there on this visit at the time when this occurred?

"A. Probably an hour or so.

"Q. You had been engaged in general conversation?

"A. Yes.

"Q. And then this matter came up?

"A. Yes.

"Q. When that paper was written, what did he do with it?

"A. He handed it to me and told me to keep it.

"Q. Did you do so?

"A. I did. I asked him if it was any good. He said, of course it was good, any judge would recognize a will like that.

"Q. Now, at that time, isn't this what occurred (reading from transcript of testimony on former trial) : 'I was sitting in the garden with him, and he was complaining about so much money being wasted in sanitariums, when he wanted me to be provided for, looked out for, and I said if he wanted me to be looked out for, he must hurry up and get well and put his business affairs in order and he said, "I can do that now," and he took this paper out of his pocket and wrote the will.' Isn't that what happened?

"A. Yes.

"Q. Did you disclose to any person the fact that he had made this paper?

"A. Yes.

"Q. To whom?

"A. Mr. Tevlin.

"Q. At the time when this paper was written, did you request any person to be present?

"A. I did not know he was going to make a will, why should I request a person to be present?

"Q. So the making of this will was an unexpected thing as far as you were concerned?

"A. Yes.

"Q. There was nothing that led up to it?

"A. No, it was just the conversation that we had as I have stated.

"Q. On that day that was the first suggestion that was made, about making any will?

"A. Yes."

Decedent remained at Belmont until the first week in April, 1915, when he was removed to the detention hospital for mental cases at San Francisco, for the purpose of having it determined whether he should be transferred to another private sanitarium for mental cases or committed to one of the state insane asylums. He was removed from Belmont to San Francisco by his guardian and the same deputy sheriff already mentioned. On the way he kept repeating the same thing as on previous trips, complaining about the people who were bothering him, saying it was awful, rubbing his hands and biting his finger-nails. He was removed in a taxicab, he and the deputy sheriff sitting in the rear seat, while the guardian sat in front with the chauffeur. While on the way he struck his guardian from behind; the guardian gave him no cause or provocation for the blow. On arrival at the detention hospital his mental condition was not any better than it was when he originally became an inmate of the Greer sanitarium after his attempt at suicide from the Sausalito boat. His delusions were there and very much fixed; he still had the same delusions that dictaphones had been installed. He had the idea that through some sort of a machine they were able to project thoughts by wireless and control his mind, and this was much more firmly fixed than on the prior occasion at Greer's sanitarium; and his mental condition was worse than that exhibited when he was at Greer's. After some deliberation and the suggestion of friends, he was removed to a sanitarium for mental cases at Livermore, California, in April, 1915. He was taken there by his guardian and the deputy sheriff already mentioned. On this trip also he complained about the people who were bothering him, said that it was awful, would rub his hands and bite his finger-nails. At this time his condition was no better than it had previously·been.

Decedent remained at the Livermore sanitarium until the beginning of March, 1916, when he was brought back again to the San Francisco detention hospital. This removal was effected by the guardian and the same deputy sheriff and the conduct of decedent during this removal was similar to

that exhibited on prior removals.    At the detention hospital his
mental condition was much worse; he was very violent, and
a judicial investigation of his case was made, with the result
that he was adjudged by the superior court of San Francisco
to be an insane person, and ordered committed as such insane
person to the state hospital for the insane at Agnews, Califor-
nia.    On March 2, 1916, he was removed to the Agnews hos-
pital by a deputy sheriff.    While in the train his delusion of
pursuit continued; he heard voices and called the attention
of the deputy sheriff to them; he kept looking behind him;
and finally the deputy sheriff removed him to the last seat
in the car, but even here he kept looking behind him and
calling the attention of the sheriff to the voices.    These
things happened five or six times during the short trip;
there was no foundation for this conduct of the decedent.
No one was pursuing him and there were no voices.

He remained at the hospital at Agnews until his death on
May 27, 1916.    About six weeks before his death, on re-
ceiving word that he was in need of clothing, the guardian
went to Agnews to supply him with an outfit; and for this
purpose procured permission for him to go in charge of an
attendant to a near-by town.    This town was reached about
lunch-time, and the party went to a restaurant where luncheon
was served to all three—the guardian, the attendant, and
decedent.    The others ate their luncheon, but decedent left
his untouched.    After luncheon, the party went toward the
clothing store, but, on the way, when passing an ice-cream
stand, decedent stated that he wanted a glass of milk; the
guardian acceded to this, and had the attendant break an
egg into the milk; and thereupon the decedent partook of
four glasses of this compound, one after the other.    On leav-
ing the ice-cream stand the party passed a fruit-stand, and
there, without any consultation with the proprietor, decedent
helped himself to two oranges, went to the curbstone and
proceeded to eat them; in the meantime the guardian settled
for the oranges.    Finally, the party reached the clothing
store; here decedent stated that he did not want any clothing,
and that the clothing he had was good enough; and the
guardian and attendant had hard work to persuade him to
take a new suit of clothes.    He was finally prevailed upon
to be fitted, and was then sent back to the hospital.

From the time of his arrest as an insane person in Oregon in December, 1912, until his death in Agnews insane asylum in May, 1916, save and except the time of his disappearance from the train at Benicia and subsequent attempt at suicide from the Sausalito boat, decedent had continuously been an inmate of one sanitarium for mental cases after another; and during all that time no application was ever made by anybody to any court to have him restored to competency, or relieved from guardianship, or released from restraint, although that was his earnest desire, although he was a lawyer himself, and although he numbered lawyers among his acquaintances.

It should be further stated as a fact bearing upon his mental capacity that from the time of his arrest as an insane person in Oregon until his death in Agnews insane asylum no business draft of any sort was made upon his mentality; he made no loans; he made no mortgages; he had no dealings in real estate; he engaged in no enterprises of any character; and from the first to the last of this period he never increased his property or estate to the extent of a single dollar by any act of his own.

Counsel for appellant concedes that findings based upon conflicting evidence cannot be reviewed upon appeal, and that the evidence shows that William G. Barr was insane. The claim is made, however, that the evidence is insufficient to support the judgment on the ground of decedent's mental incompetency to make a will. It is claimed "that the contestant and respondent has failed to sustain the burden of proof, and that there is *no* evidence to support the finding in his favor."

It is admitted that decedent, from December 12, 1912, to his death in 1916, was suffering from a form of insanity characterized by systematized delusions; none of them, it is claimed, was operative in the alleged testamentary act. [1] In this connection appellant says in her brief: "It devolved upon the contestant to prove the incompetency of the testator; it devolved upon him to prove incompetency at the very moment of the execution of the will; it devolved upon him to prove that the will upon its face was not a rational act; that it was not made during a lucid interval; and that the delusion of the testator controlled his volition in

its execution.'' This statement of appellant is sound and is supported by authority. But appellant misconceives the applicability of certain legal rules obtaining in a will contest, and also the power of the appellate court in the premises. **[2]** In considering the insufficiency of the evidence to support the finding, it is well to bear in mind that the trial court was warranted in believing as true all of the evidence in support of contestant's claims (unless it was inherently so improbable as to be entirely unworthy of belief) and in disregarding as untrue all of the evidence in behalf of proponent which was in any way contradicted or otherwise impeached. It is likewise the duty of the appellate court, in reviewing the facts, to interpret the evidence so as to support the finding, to the extent that it is reasonably susceptible thereto in the light of the foregoing rule. (*Estate of Russell,* 189 Cal. 759, 763 [210 Pac. 249].) **[3]** As to the power of the appellate courts in the premises it was said in *Estate of Snowball,* 157 Cal. 301 [107 Pac. 598], in will contests the rule is the same as in other proceedings, that all questions of the weight of the evidence and the credibility of the witnesses are for the trial court, and if there be any substantial evidence to support the finding it cannot be set aside by the reviewing court, although said court might believe the great preponderance of the evidence was the other way.

Appellant, while admitting that decedent was insane, insists that the purported will was written in a lucid interval. Much of the evidence, testimonial and documentary, showed the condition of Mr. Barr's mind before and after writing the document in dispute. Proponent and her sister both testified that decedent was sane when he performed the alleged testamentary act. Friends and hospital attendants testified that while at times decedent suffered from delusions, there were intervals when he appeared and acted rational. Two alienists, on behalf of contestant, gave it as their opinion that decedent was an incurable paranoiac. **[4]** Without attempting to analyze the mass of evidence presented upon this subject, suffice to say that it but presents the common situation of a conflict of evidence which was to be resolved by the trial court. (*Estate of Russell,* 189 Cal. 759, 768 [210 Pac. 249].)

In the *Estate of O'Connor,* 51 Cal. App. 339 [196 Pac. 792], a will was refused admission to probate upon the ground that the testatrix was not of sound and disposing mind at the time the instrument was signed by her. In that case Mr. Justice Waste, then presiding justice of this court, makes a clear statement of the law which we think is applicable here. For our conclusion we may well paraphrase the language found on page 346 of the opinion (196 Pac. 792).

[5] Much evidence was admitted on both sides to show the condition of Mr. Barr's mind before and after the date of his testamentary act. Such evidence was relevant and important for its bearing upon the condition of his mind when the will was executed. (*Estate of Wilson,* 117 Cal. 262, 276 [49 Pac. 172, 711]; *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932].) This evidence was entitled to such weight and consideration as the trial court thought it deserved. (*Dunphy* v. *Dunphy,* 161 Cal. 380, 385 [Ann. Cas. 1913B, 1230, 38 L. R. A. (N. S.) 818, 119 Pac. 512].) It tended on the part of the contestant to show that Mr. Barr was afflicted with a gradually increasing unsoundness of mind, always manifest and ever present, affecting his mental capacity before and after the date when he made the questioned will. Other evidence, mostly that in behalf of proponent, tended to show he was suffering from a form of insanity characterized by systematized delusions with lucid intervals in between. Appellant contends that the evidence fails to show that the testamentary act was not performed in a lucid interval. But from this entire evidence the trial court could have concluded either that Mr. Barr had no testamentary capacity during the period from December 12, 1912 (the date of his commitment for insanity in Oregon), to his death in 1916, or that the will was not executed during a lucid interval of his mind. [6] In this condition of the case upon the testimony the decision of the trial court cannot be disturbed upon the ground that it was contrary to the evidence. (*Estate of Jones,* 166 Cal. 108, 110 [135 Pac. 288]; *Estate of Martin,* 170 Cal. 657, 663, [151 Pac. 138]; *Estate of Russell,* 189 Cal. 759, 768 [210 Pac. 249].)

The judgment is affirmed.

Knight, J., and Tyler, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal was denied by the supreme court on November 21, 1924.