FRED F. ROWCLIFFE <em>et al.</em> Defendants in Error, <em>vs.</em> ELLA L. ROWCLIFFE BELSON <em>et al.</em> Plaintiffs in Error.

<em>Opinion filed February 21, 1914.</em>

1. WILLS—<em>proponents have a right to show what contestants' witnesses mean by "ordinary business."</em> Where witnesses for the contestants have given opinions that the testator was not competent to transact ordinary business the proponents have a right to cross-examine such witnesses to show what they mean by "ordinary business," as there is no universally accepted standard of what constitutes ordinary business and the jury are entitled to know what standard is in the mind of the witnesses.

2. SAME—<em>proof that the contestants received and cashed drafts from testator is competent.</em> Proof that five of the testator's sons, who are complainants in a bill to contest the will upon the ground of lack of testamentary capacity, received from the testator and cashed drafts sent to them by him some two months before his death and after the will was made, is competent, both as tending to show the testator's ability to transact ordinary business and as having the force of an admission by such complainants that the testator was competent at that time to dispose of his property.

3. SAME—<em>when verdict setting aside will cannot be sustained.</em> A verdict and decree setting aside a will upon the ground that the

testator did not have sufficient testamentary capacity cannot be sustained, where there is no evidence tending to disprove the testimony of reputable, disinterested witnesses that the testator transacted his business, managed his three farms and did his banking business without requiring assistance.

4. SAME—*when difficulty between testator and his wife should not be gone into at length.* A difficulty between the testator and his wife resulting in a separation and his transfer to her of land and money should not be gone into at length in a proceeding to contest his will, where the only effect of the evidence is to lead the jury to believe the testator was unfair in nature and disposition and to prejudice the defense.

5. SAME—*one capable of transacting ordinary business is capable of making a will.* One who is capable of transacting the ordinary business affairs of life is capable of making a will, but the ability to transact ordinary business is a higher test of capacity to make a will than the law requires.

6. SAME—*a less degree of capacity is required to make a will than to make contracts.* A less degree of mental capacity is required to make a will than to make contracts and transact ordinary business involving a contest of reason, judgment and experience and the exercise of mental powers not at all necessary to the testamentary disposition of property.

7. SAME—*the real test of testamentary capacity.* The real test of testamentary capacity is not whether the testator had sufficient mental capacity to transact ordinary business, but whether he had sufficient mind and memory to enable him to understand the business in which he was engaged.

8. SAME—*when instruction upon subject of testamentary capacity is erroneous.* An instruction upon the subject of testamentary capacity is erroneous which eliminates all the testimony for the proponents that the testator could, and did, transact ordinary business, and permits the jury to substitute the mere opinions of witnesses that he was not of sound mind as the test of his ability to make a will. (*Dowie* v. *Sutton,* 227 Ill. 183, distinguished.)

9. SAME—*it is wrong for an instruction to refer to depriving heirs of property.* An instruction stating that a will is not valid unless the jury believe, from the evidence, that the testator was capable of understanding to whom he was giving his property and whom he was depriving of it as his heirs is erroneous, as the persons who would be his heirs had no interest in his property and would not be deprived of property by the will.

10. SAME—*what does not tend to show that the testator did not know his property.* The fact that the testator's home farm was de-

scribed in the will as the north half of a certain quarter section instead of the south half does not tend to show he did not know his property, where the evidence is conclusive that he did know it and pointed out the property on a map, but that the attorney who drew the will, or his stenographer, made the mistake in making or transcribing the notes.

11. Same—*what does not tend to show that the testator did not know the objects of his bounty.* The fact that one grandchild, out of a total of twenty-five children and grandchildren, was not mentioned in the will does not tend to show that the testator did not know the objects of his bounty.

Writ of Error to the Circuit Court of Ford county; the Hon. George W. Patton, Judge, presiding.

Schneider & Schneider, and Kerr & Lindley, for plaintiffs in error.

Cloud & Thompson, and A. L. Phillips, for defendants in error.

Mr. Justice Cartwright delivered the opinion of the court:

On November 14, 1911, Henry Rowcliffe, a resident of Ford county, died at the age of eighty years, leaving a last will and testament executed on September 28, 1909, which was admitted to probate in the county court of that county. He had been twice married and was the father of eighteen children, five of whom had died, two of them leaving children. Of the thirteen living children, five of them were born of the first marriage and eight of the second. He left Sarah Rowcliffe, his widow, and the thirteen living children and grandchildren from each marriage, his heirs-at-law. The eight living children of the second marriage filed their bill in the circuit court of Ford county to set aside the probate of the will. There were minor defendants who had adverse interests, and A. L. Phillips, an attorney, was appointed guardian *ad litem* for some of them,

and Frank Lindley, an attorney, guardian *ad litem* for others. Frank Lindley filed a cross-bill as guardian *ad litem* for one of the minors for the purpose of correcting a misdescription of land in the will, in which the south half of a quarter section was misdescribed as the north half. Answers were filed to the original bill and cross-bill and an issue was formed for a jury under the original bill. There was a verdict that the instrument was not the last will and testament of Henry Rowcliffe, and the court entered a decree upon the verdict, setting aside the will and the probate thereof, which also disposed of the cross-bill. The adult defendants, and the minors for whom Frank Lindley was guardian *ad litem,* by him as next friend, sued out a writ of error and brought the record to this court.

The bill charged a want of testamentary capacity and the exercise of undue influence, and there was not only no evidence tending to prove undue influence, but it was proven that the scheme of the will was devised by the testator himself. The court therefore withdrew the issue of undue influence from the jury and submitted to them the issue of mental capacity, alone.

Henry Rowcliffe owned three farms, of eighty acres each, at the time of his death, and also left $14,000 in personal property, $11,000 of which was in money deposited in a bank. The witnesses to sustain the will were bankers, farmers, tenants of the testator, a merchant and a barber, all of whom had known the testator for many years and had done business with him, and they all testified that he transacted his business intelligently, managed his farms, leased them, sold the grain, placed his money in the bank on time certificates, collected the interest, renewed the certificates from time to time as they came due, transacted all his business, and that he had never had or required any assistance. These witnesses gave their opinions that he was entirely capable of transacting business and attending to the ordinary affairs of life, and the facts related by

them, which were not contradicted or weakened by adverse testimony, showed a substantial basis for their conclusions. On the other hand, there was a larger number of witnesses who gave opinions that the testator was not of sound mind and memory, based on seeing him on the street or sitting in front of a store where he was accustomed to sit in pleasant weather, or at his home, and noticing that he did not look well; that he was not as heavy as in former years; that he had a difficulty of speech; that on meeting them he would sometimes reply to a salutation and sometimes would not; and that his general appearance was indicative of old age and a general failure of the faculties. Some of the witnesses were unable to give any opinion concerning his ability to transact ordinary business, but some gave opinions that he was not competent to transact such business. The court denied to the defendants the privilege of cross-examination to inform the jury what these witnesses meant by "ordinary business." The court erred in such ruling, because there is no universally accepted standard of what constitutes ordinary business, and the jury ought to know what standard is in the mind of the witness. The court sustained objections to questions whether the witnesses knew that the testator did or did not attend to his business, collect his rents, deposit his money, make leases and sell grain, but so far as the understanding of the witnesses was brought out, it was that he would be competent to trade at the store but not to do business requiring mental ability, breadth of knowledge and accuracy in business affairs.

The defendants offered to prove that about two months before the testator died he went to his bank and procured drafts for $500 each to send to each of his five sons of the second marriage, who were complainants, and sent them to said sons, and that they were indorsed by them and paid, but the court rejected the testimony and refused to admit the drafts in evidence. The evidence was competent, both

as tending to show ability to transact ordinary business, and also for the reason that the complainants attacking the ability of the testator to dispose of his property received considerable amounts of money without question, which had the force of an admission that he was competent, at that time, to dispose of property.

There was no substantial evidence that the testator had shown a want of ability to attend to his affairs, unless it was the testimony of a son, John Rowcliffe, a devisee, who was permitted to testify on the ground that he would receive more as a devisee than if the will were set aside. He said that when he went to his father to pay his rent, at some time not stated, his father asked him how much he had, and he told his father to count it, and his father said that he could not count it, and put it in his pocket and took it to someone else to count, who counted it and handed it back. Complaint is made that the court improperly interfered with the attorney for the defendants in the cross-examination of this witness, but from the recital in the bill of exceptions as to the manner and demeanor of the attorney the court was justified in the admonition given.

In the earlier years the testator was what was termed a "periodical drinker," and sometimes got drunk, with the usual consequences. He and his second wife separated in 1902, and she brought suit against him for separate maintenance. The suit was settled, and he conveyed to her in December, 1902, eighty acres of land in Ford county and paid her $1500, in consideration of which she released all claims to his property. She then established a home in Melvin, in that county, and he lived at the home a larger part of the time afterward, until his death. In 1903 he had a slight stroke of paralysis, with no other effect than that his speech was impaired, and as a result he was not as talkative as before. He went about as usual, hitched up his horse, drove to his farm, looked after repairs and his business generally. He was accustomed to sit, in pleasant

weather, in front of a store, and in May, 1909, he was sitting on or leaning against a railing around an area in front of that store when he fell into the area and landed on his head, making a bad scalp wound. He was unconscious for a day or two, but in a few days got so he could talk and was able to answer questions. The doctor who attended him in 1903 and up to his death was a witness, and attributed his fall into the areaway to a second stroke of paralysis, but said that when he became conscious and his mind cleared up he answered questions intelligently and seemed to understand them. The doctor thought he had enough mental capacity to attend to simple business affairs such as were connected with his farms but did not have as much mental ability after 1903 as he had before. He testified that the testator was afflicted with arterial sclerosis, interstitial nephritis, (or Bright's disease,) arcus senilis, (which is a degeneration of the cornea of the eye, indicative of old age,) Argyle-Robertson pupils, (where the eye re-acts to accommodation but not to light,) and cirrhosis of the liver, but that he finally died with acute gastritis.

There was no evidence tending to disprove the testimony that the testator transacted his business, managed his three farms and did his banking business, and the verdict was contrary to the weight of the evidence.

The difficulty between the testator and his wife in 1902 was gone into at length, for the purpose of showing that he treated her badly. The reason advanced by counsel is, that in making his will he gave to his wife five dollars and recited at length his reason for doing so, stating that she left him without cause and willfully, and still refused to live with him, and stating the litigation and settlement in satisfaction of her dower, homestead, widow's award and all interest in his property. It would be quite unusual for one party to a quarrel not to regard the other as in fault, and the fact that the testator thought that he was not to blame for the separation and that his wife left him without

cause had no tendency to prove any insane delusion on his part. She had relinquished her rights for a valuable consideration, and the evidence concerning his behavior toward her at that time, and particularly when drunk, had no relation to the case and only tended to prejudice the defense. The only effect of introducing the evidence would be to lead the jury to believe the testator was unreasonable and unfair in nature and disposition.

The court gave to the jury instruction "F," as follows:

"You are instructed by the court that even if you should believe, from the evidence, that Henry Rowcliffe had sufficient mind and memory to attend to the ordinary business affairs of life, yet if you believe, from the evidence, that at the time of the signing of the alleged will he was not of sound and disposing mind and memory, and that because of such condition he was unable rationally to comprehend the nature and effect of the provisions of the alleged will, then you should find that it is not the will of the said Henry Rowcliffe."

It has always been held that one who has sufficient mind and memory to attend to the ordinary business affairs of life is capable of making a will. (*Meeker* v. *Meeker,* 75 Ill. 260; *Greene* v. *Greene,* 145 id. 264; *Craig* v. *Southard,* 148 id. 37; *Taylor* v. *Cox,* 153 id. 220.) The converse of the proposition is not always true. (*Waters* v. *Waters,* 222 Ill. 26.) The ability to transact ordinary business is a higher test of capacity to make a will than the law requires. A less degree is required for the execution of a will than for the making of contracts and the transaction of ordinary business involving a contest of reason, judgment, experience and the exercise of mental powers not at all necessary to the testamentary disposition of property. (*Ring* v. *Lawless,* 190 Ill. 520; *Waugh* v. *Moan,* 200 id. 298; *Hurley* v. *Caldwell,* 244 id. 448; *Kellan* v. *Kellan,* 258 id. 256; *In re Estate of Weedman,* 254 id. 504.) The real test of testamentary capacity is not whether a testator

has sufficient mental capacity to transact ordinary business, but whether he has sufficient mind and memory to enable him to understand the business in which he is engaged, which is a lower degree of capacity than required to transact ordinary business. (*Trubey* v. *Richardson,* 224 Ill. 136.) The instruction reversed the rule, and advised the jury that one may be capable of transacting ordinary business and yet incapable of making a valid will because not of sound, disposing mind and memory, which in the law means testamentary capacity. It eliminated all the testimony of the defendants that the testator could, and did, transact ordinary business, and permitted the jury to substitute the opinions of witnesses that he was not of sound mind and memory as a test of his ability to make a will, and the instruction was wrong. In *Dowie* v. *Sutton,* 227 Ill. 183, instruction 15 was to the effect that although Sutton could transact ordinary business, yet if he was insane regarding the subject connected with the testamentary disposition and distribution of his property and his will was the product of his insane delusion it was not valid; but that was a different proposition from the one stated in this instruction.

By instruction "E" the court told the jury that the will was not valid unless they believed, from the evidence, that he was capable of understanding to whom he was giving his property and in what proportions, and whom he was depriving of it as his heirs who would otherwise have inherited it. That was wrong, because his heirs had no interest in his property of which they could be deprived, and he did not deprive them of anything by his will. *Brainard* v. *Brainard,* 259 Ill. 613.

Instruction "I" advised the jury that if the testator was not capable of knowing what property he possessed they should find against the validity of the will, and if he was not capable of knowing who were the natural objects of his bounty they should find against it. There was no evi-

dence that he did not know his property, but his home farm was described in the will as the north half of a quarter section when, in fact, it was the south half. There was not the slightest reason for saying that he did not know his farm and where it was, but when he made the will he pointed out his property on a map, and the attorney or stenographer who took the dictation in some way got the north half instead of the south half, either in the notes or in transcribing them. The evidence was conclusive and uncontradicted that the testator did know his property. He had twenty-five children and grandchildren, all of whom were enumerated in the will with the exception of one grandchild, whose name was omitted. Whether the omission was intentional or accidental, through the child being overlooked, it would not show that he did not know that the natural objects of his bounty were his children and grandchildren. There was no evidence fairly tending to prove he was ignorant of the existence of the child, and therefore did not know who were the natural objects of his bounty.

The jury were allowed to consider, on the question of mental capacity, whether the will was reasonable or unreasonable, which the law allows, but there was, in fact, nothing in the will which could be regarded as unreasonable. It gave life estates and limited remainders, and, when the property conveyed to his second wife is considered, it was as liberal toward her children as to those of the first marriage.

We conclude that the verdict was against the weight of the evidence, and for that reason and for the errors of the court the decree is reversed and the cause remanded.

*Reversed and remanded.*