[L. A. No. 9147. In Bank.—December 9, 1926.]

In the Matter of the Estate of MARY SEXTON, Deceased. HENRY 'SEXTON, Respondent, v. ALVA DALY et al., Appellants.

[1] NEW TRIAL—INSUFFICIENCY OF EVIDENCE.—DISCRETION—APPEAL. A motion for a new trial on the ground of insufficiency of the evidence to justify the verdict or other decision is addressed to the sound legal discretion of the trial court, and its action in granting the motion will not be disturbed on appeal unless it appears that there was a clear abuse of such discretion.

[2] ID.—ESTATES OF DECEASED PERSONS—MENTAL COMPETENCY—EVIDENCE.—In a will contest, if the entire evidence upon the issue of mental competency of the decedent is of such a character that it would not have supported a verdict for the contestant had the jury brought in such a verdict, it should be held that the trial court abused its discretion in granting a new trial after the jury had returned a verdict of upholding the will.

[3] ID.—TESTAMENTARY CAPACITY—RULE.—A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relation to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument; and the actual mental condition of the testator at the time of the execution of the will is the question to be determined.

[4] ID.—MENTAL CONDITION—EVIDENCE.—Evidence of mental condition of the testator before and after the execution of the will may be relevant and admissible but is important only in so far as it tends to show mental condition at the time of executing the testamentary document, and if there exists a reasonable and logical relation between it and the issue as to mental competency at the moment of execution, it should be given such weight as the jury thinks it deserves.

[5] ID. — MENTAL DERANGEMENT — PROOF OF. — Not every degree of mental unsoundness or mental weakness will suffice to destroy

1. See 20 Cal. Jur. 111; 20 R. C. L. 275.
2. See 26 Cal. Jur. 1102.
3. See 26 Cal. Jur. 635, 637; 28 R. C. L. 86.
4. See 26 Cal. Jur. 636.
5. See 26 Cal. Jur. 631.

testamentary capacity, and one contesting a will, upon this ground, must either show such a complete mental derangement of the testator as denotes utter incapacity to know and understand those things which a testator must be able to know and understand in order to possess testamentary capacity or a specific insane delusion which affected the making of the will in question.

[6] ID.—TESTAMENTARY CAPACITY—PRESUMPTIONS—BURDEN OF PROOF. Testamentary capacity is always presumed to exist until the contrary is established, and the burden is always upon the contestant to show affirmatively and by a preponderance of evidence that the testator, at the time of executing the will, was of unsound mind.

[7] ID.—INSUFFICIENCY OF EVIDENCE.—In this will contest it is held that the evidence was insufficient to establish lack of testamentary capacity in the testator at the time of the execution of the will.

[8] ID. — ABILITY TO TRANSACT BUSINESS. — Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity, and mental perception and power of a lesser degree than this may be sufficient to execute a will.

[9] ID.—MENTAL CAPACITY—EXPERT OPINION.—In a will contest testimony of a doctor that he does not believe the testatrix was capable of making a will has no probative value, in the absence of a showing that the witness is acquainted with the law's criterion of testamentary capacity.

[10] ID.—OPINIONS OF LAY WITNESSES.—The opinions of lay witnesses as to the mental capacity of a testatrix have no greater probative force than the facts given by them as the bases for their conclusions.

---

(1) 4 C. J., p. 833, n. 57, p. 834, n. 58; 29 Cyc., p. 1009, n. 54.
(2) 4 C. J., p. 834, n. 63, 65; 40 Cyc., p. 1343, n. 35.   (3) 40 Cyc., p. 1004, n. 4, p. 1028, n. 75.   (4) 38 Cyc., p. 1516, n. 57; 40 Cyc., p. 1028, n. 77, p. 1029, n. 82.   (5) 32 C. J., p. 594, n. 28, 29, 30, 31, 32, 33, 34; 40 Cyc., p. 1024, n. 43 New.   (6) 40 Cyc., p. 1018, n. 1, p. 1020, n. 11.   (7) 40 Cyc., p. 1023, n. 29.   (8) 40 Cyc., p. 1007, n. 14.   (9) 40 Cyc., p. 1037, n. 45 New.   (10) 40 Cyc., p. 1041, n. 58.

APPEAL from an order of the Superior Court of Los Angeles County granting a new trial.   Walton J. Wood, Judge.   Reversed.

---

6.   See 26 Cal. Jur. 756.
8.   See 26 Cal. Jur. 675; 28 R. C. L. 88.
9.   See 26 Cal. Jur. 743.
10.   See 26 Cal. Jur. 745.

The facts are stated in the opinion of the court.

Joseph Scott and A. G. Ritter for Appellants.

Verge, Coony, Davin & Kearney, Arthur C. Verge and 'A. H. De Tremaudan for Respondent.

FINLAYSON, J.—This is an appeal from an order granting a new trial in a will contest after the jury had returned a verdict upholding the will.

The document offered for probate was executed by Mary Sexton at San Francisco, on July 12, 1921. She died about three years later. Alva Daly, a daughter of the decedent, named in the proffered will as executrix, offered the instrument for probate. In due time Henry Sexton, the surviving husband of the testatrix, appeared and filed a contest. An answer to the contest was filed by all but one of those who were named in the will as legatees and devisees. Those thus answering will hereafter be referred to as the "proponents." The husband contested the will upon the grounds of insufficiency of execution, undue influence, and mental incompetency. A nonsuit was granted as to the first two grounds. The issue as to mental competency was submitted to the jury, resulting in a verdict for the proponents. Thereupon the contestant moved for a new trial upon a number of statutory grounds, one of which was that the evidence was insufficient to justify the verdict. The trial court granted the motion, and in so doing specifically stated in the order that the motion was granted upon the ground of insufficiency of the evidence to justify the verdict. It is from that order that the proponents have appealed.

Though something is said in the briefs about the sufficiency of the evidence upon the issue as to undue influence, we do not understand counsel on either side seriously to contend for a review of the trial court's disposition of that issue. On the contrary, it seems to be assumed in the briefs on both sides that the sole question to be considered here is this: Was the trial court warranted in granting a new trial upon the ground of the insufficiency of the evidence to justify the jury's finding of mental competency? For the purpose of this decision we shall adopt

counsel's assumption and shall confine our attention to that one question.

[1] A motion for a new trial on the ground of insufficiency of the evidence to justify the verdict or other decision is addressed to the sound legal discretion of the trial court, and its action in granting the motion will not be disturbed on appeal unless it appear that there was a clear abuse of such discretion. (*Warner* v. *Thomas etc. Works,* 105 Cal. 409 [38 Pac. 960]; *Estate of Motz,* 136 Cal. 558 [69 Pac. 294]; *Estate of Everts,* 163 Cal. 449 [125 Pac. 1058]; *Estate of Wall,* 183 Cal. 431 [191 Pac. 687]; *De Vall* v. *Perrin,* 34 Cal. App. 676 [168 Pac. 584].) The precise test whereby to determine when a trial court abuses its discretion in granting a new trial after the verdict of a jury upholding a will appears not to have been determined by any previous decision of this court. [2] This much, however, seems certain: If the entire evidence upon the issue of mental competency is of such a character that it would not have supported a verdict for the contestant had the jury brought in such a verdict, then it should be held that the trial court abused its discretion in granting the new trial. Indeed, this seems to be the view taken by counsel on both sides of this appeal. The question then is this: If the jury had found for contestant would its verdict have totally lacked the support of substantial evidence? If it would, then the order granting the new trial must be reversed.

Mary Sexton died at Santa Monica Canyon, in Los Angeles County, on September 25, 1924, at the age of sixty-four years. She left surviving her the contestant, a second husband to whom she was married in 1899, one child by that husband and five children by her first husband. The proponents of the will are the five children by the first husband. By the terms of the will she left all of her property to her six children, share and share alike. She suffered a slight stroke of apoplexy in 1913—eleven years before her death. During the ensuing years of her life she suffered a few other slight strokes, and finally, a few days before her death, she was the victim of a very severe stroke, from the effects of which she died. The stroke which she suffered in 1913 left her face twisted and her right side paralyzed, so that she walked with a limp. For a

long time prior to the execution of the will on July 12, 1921, her organs of speech were so affected by the preceding apoplectic stroke or strokes that her ability to speak was considerably affected. As some of the witnesses put it, she had "some throat affection" and "could not talk above a whisper." For many years prior to her death she and contestant resided together at Santa Monica Canyon. From the latter part of May to about the middle of July, in 1921, Mrs. Sexton was the guest of her daughter, Mrs. Daly, and of a son, both of whom lived in the central part of the state—the daughter in San Francisco and the son at Lodi. The first two weeks of the visit were spent by Mrs. Sexton with her daughter at the latter's apartment in San Francisco. Then she visited her son and his family at Lodi, remaining with them until the early part of July, when she returned to Mrs. Daly's home in San Francisco, where she remained until she returned to her own home in Santa Monica Canyon about the middle of July. On her trip from Santa Monica Canyon to San Francisco, as well as on her trip from the latter city to Lodi, Mrs. Sexton was accompanied by Mrs. Daly. But it seems that on the return trip from her son's home at Lodi to her daughter's apartment in San Francisco she traveled alone and unassisted.

According to the testimony of Mrs. Daly, her mother, almost from the time of her arrival in San Francisco in the latter part of May, repeatedly said that she wanted to make her will. Accordingly, Mrs. Daly, shortly after her mother's return from Lodi, requested Mr. Daly, her husband, to ask some lawyer to come to their apartment for the purpose of drafting a will in accordance with her mother's wishes. On the evening of July 11th there arrived at the apartment an attorney who practiced his profession in San Francisco and who had been requested by Mr. Daly to call. Present upon that occasion were the lawyer, the testatrix, a son by the first husband, the daughter, Mrs. Daly, and the latter's husband. The lawyer talked with Mrs. Sexton about the nature of the will which she wished to make, received instructions from her and made such notes as were necessary to enable him to prepare the document. After about an hour's stay he took his departure. The next day Mrs. Sexton, her son and Mrs.

Daly went to the lawyer's office. Meanwhile the lawyer had drafted the document in accordance with the instructions given him by Mrs. Sexton, and it was ready for execution by her when she called at his office. The lawyer, accompanied only by Mrs. Sexton, stepped across a hall from his office into an office occupied by two other lawyers, both of whom witnessed the execution of the will. The lawyer by whom the document was drawn read it to Mrs. Sexton before she signed it. After it was duly subscribed and properly witnessed it was delivered by the attorney to Mrs. Sexton, who thereafter handed it to her daughter, presumably for safekeeping.

It is apparent from what has been said that this is not a case of delusion taking hold of a vigorous mind, but of a loss of mental power; that it is not the case of an irregular working of the mental faculties, but of a ceasing to work with normal strength. It was contestant's theory at the trial, not that Mrs. Sexton was an irrational lunatic, an idiot or a congenital imbecile, or that she was the victim of insane delusions, but that her mental processes were so benumbed by the paralytic strokes that her mind was not strong and clear enough to be able to make a valid disposition of her property by will. Without doubt she was a woman of weakened mentality at the time when she executed her will. Her intellectual faculties were considerably enfeebled. But the question is: Was there any substantial evidence to show that her mental weakness was of such a degree that it incapacitated her from making a valid will? Was she, in short, a woman of sound and disposing mind and memory? Before proceeding to a more detailed consideration of the evidence it may aid us to a correct solution of this question if we briefly advert to a few rules of law applicable to cases of this character.

[3] A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument. (*Estate of Motz, supra; Estate of Dole*, 147 Cal. 188 [81 Pac. 534]; *Estate of Huston*, 163 Cal.

166 [124 Pac. 852]; *Estate of De Laveaga,* 165 Cal. 607
[133 Pac. 307]; *Estate of Casarotti,* 184 Cal. 73 [192 Pac.
1035].) The actual mental condition of the testator *at the
time of the execution of the will* is the question to be de-
termined. (*Estate of Perkins,* 195 Cal. 699 [235 Pac. 45];
26 Cal. Jur. 635.) [4] Evidence as to mental condition
before and after the execution of the will may be relevant
and admissible, but it is important only in so far as it
tends to show mental condition at the time of executing the
testamentary document. That is to say, facts as to men-
tal condition, whether anterior or subsequent to the date
of the execution, depend for their probative force upon the
clearness and certainty with which they tend to demon-
strate the condition of mind and memory at the moment
the will is executed. (*Estate of Perkins, supra.*) Evidence
of mental condition before or after the execution of the
will, if it have evidentiary force, i. e., if there exist a rea-
sonable and logical relation between it and the issue as to
mental competency at the moment of execution, is to be
given such weight as the jury thinks it deserves. (*Estate
of O'Connor,* 51 Cal. App. 339 [196 Pac. 792]; *Estate of
Barr,* 69 Cal. App. 16, 34 [230 Pac. 181].)

[5] "Insanity" is a broad, comprehensive and generic
term of ambiguous import. In a medical sense it is used
to denote any unsound and deranged conditions of the
mind, and every degree of mental unsoundness, whatever
may be its source or cause. (32 C. J. 594.) But mere
proof of mental derangement, or of insanity in a medical
sense, is not sufficient to invalidate a will. Not every de-
gree of mental unsoundness or mental weakness will suf-
fice to destroy testamentary capacity. The contestant is
required to go further than that. He must either show
such a complete mental derangement as denotes utter in-
capacity to know and to understand those things which a
testator must be able to know and to understand in order
to possess testamentary capacity, or he must show the ex-
istence of a specific insane delusion which affected the
making of the will in question. (*Estate of Shay,* 196 Cal.
355 [237 Pac. 1079].) In other words, mental derange-
ment sufficient to invalidate a will must be an unsound-
ness of mind in one of two forms: (1) mental unsoundness
of such broad character as to establish incompetency gen-

erally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. And even in the latter class of cases it is not sufficient merely to establish that the testator was the victim of some hallucination or delusion; it must be shown that the will was the offspring of the hallucination or delusion. (*Estate of Perkins, supra.*)

[6] Testamentary capacity is always presumed to exist until the contrary is established. That is to say, the presumption is always that a person is sane, and the burden is always upon the contestant to show affirmatively and by a preponderance of evidence that the testator, at the time of executing the will, was of unsound mind. (*In re Wilson,* 117 Cal: 262 [49 Pac. 172, 711]; *Estate of Perkins, supra*; 26 Cal. Jur. 756.)

[7] If these principles of law be applied to the facts of this case the conclusion is irresistible that the evidence, considered in its entirety, falls short of establishing lack of testamentary capacity at the time of executing the will. The only direct evidence of facts existing when the instrument was executed is that which was given by witnesses for the proponents, who testified substantially as follows: Mr. Morris, the attorney who drew the will, testified that in the course of his conversation with the testatrix on the evening preceding the execution of the document she gave him a list of the persons to whom she wished to leave her property; that she expressed concern about the welfare of her children; that she answered all questions asked her; that she appeared to understand the questions; that in his opinion she acted rationally; that she was a sweet, elderly lady; that he gained the impression that her mind was perhaps not as brilliant as it had been in bygone years, but that he attributed that condition more to advancing years than to anything else; that on the day the will was executed he read it to her before she signed it, and that she then said, "That is just the way I want it"; that there was nothing in her conversation or actions which appeared to him to be peculiar or out of the ordinary. Mr. Duane, one of the witnesses to the will, testified that he did not observe anything unusual or out of the ordinary in the appearance or actions of the testatrix during the ten minutes or so that the parties were occupied with the formal-

ities of the execution—that she did not make any more impression upon him than any other individual would. Judge Jacks, the other attesting witness, gave testimony of like import. The testimony of these three gentlemen— lawyers trained in their profession and who had an abundance of opportunity to observe the testatrix at the very moment of the execution of the will—discloses to us an elderly woman, spent with years, whose mental faculties were somewhat dimmed but who, nevertheless, was clearly able to comprehend the business in which she was engaged and to know and to understand those other things which the law requires a testatrix to be able to know and to understand in order to have capacity to make a valid testamentary disposition of her property. Proponents produced a number of other witnesses, relatives, and intimate acquaintances of the deceased, who testified to the mental soundness of the testatrix at about the time of, as well as before and after, the date of the execution of the will. Each of these witnesses, besides stating that in his or her opinion testatrix was mentally sound, related conversations and described acts of the decedent at about the time of, or shortly before or after, the execution of the testamentary document. These conversations and acts picture to us a woman possessed of a mind sufficiently clear and strong to make a valid will, albeit she was worn with age and her intellectual faculties were somewhat enfeebled by the paralytic strokes from which she had suffered.

A clear case of testamentary capacity of the decedent, *at the very time* of the execution of the will, having been made by the evidence of the proponents, the question is: Did the contestant introduce evidence so inconsistent with and contradictory of that adduced by the proponents that it would have been sufficient to support a verdict for contestant under the "conflicting evidence" doctrine, if the jury had seen fit to bring in such a verdict? We think not.

The evidence is so voluminous that it would be impracticable to give even a synopsis of the testimony of every one of contestant's many witnesses. It will suffice, however, if we give a brief statement of the testimony of one or two of his principal witnesses, setting forth those parts of their testimony upon which he especially relies, with comments thereon as we proceed, and point out the rea-

sons why we think such selected portions insufficient to support any other verdict than the one which was actually returned by the jury.

Dr. Mortensen, a physician who became acquainted with Mrs. Sexton in 1906, and who at times attended her professionally, testified that she suffered from the effects of chronic high blood-pressure or arterial sclerosis; that prior to the execution of the will she had suffered from several slight paralytic strokes from which she only partially recovered; that from 1917 she gradually grew worse; that in 1921 her appearance was that of an old lady, one whose life had been partly spent and whose mental activities were extremely weak; that he would not say she was irrational, but that he would say she was feeble minded from 1917; that she would not frequently initiate conversations; that he believed she understood at all times in 1921 her relationship to contestant, and that she was able to and did recognize her relatives; that in his opinion she would not, in the month of July, 1921, "be able to transact any important business, such as the making of a last will and testament."

Counsel for contestant lay much stress upon Dr. Mortensen's opinion that the testatrix, in July, 1921, would not be able to transact any important business, such as the making of a last will. In stressing this testimony counsel have adopted a false standard of testamentary capacity and have overlooked the fact that no witness, lay or expert, may usurp the province of the jury to determine the ultimate question of decedent's capacity to make a will. The first part of the doctor's opinion, that wherein he assumes to say that the testatrix was not able to transact any *important* business, is entirely consistent with ability to make a valid will. [3] Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity; though it seems to be quite generally but mistakenly supposed, outside the ranks of the legal profession, that a capacity to transact important business is the criterion of fitness to make a valid will. Says the Iowa supreme court: "While, as every lawyer knows, a man may be capable of making a good will after he is so far gone in imbecility and mental darkness as to be no longer capable of making a valid deed or of

transacting business generally, the very opposite conclusion seems to pervade the lay mind, and the making of a will is, to its apprehension, the one item of business which requires the presence of all one's faculties in their normal strength.'' (*Perkins* v. *Perkins*, 116 Iowa, 253 [90 N. W. 55].) A person who has mental power to understand and to transact the ordinary business affairs of life doubtless has capacity to make a valid will. But the converse is not necessarily true. Mental perception and power to think and reason of a lesser degree than that which is required in the understanding and transaction of ordinary business may be all that is requisite to the full understanding of everything involved in the execution of a will. (*Rowcliffe* v. *Belson*, 261 Ill. 566 [Ann. Cas. 1915A, 359, 104 N. E. 268]; *Ravenscroft* v. *Stull*, 280 Ill. 406 [Ann. Cas. 1918B, 1130, 117 N. E. 602]; *Ring* v. *Lawless*, 190 Ill. 520 [60 N. E. 881]; *Craig* v. *Southard*, 148 Ill. 37 [35 N. E. 361]; *Stubbs* v. *Houston*, 33 Ala. 555; *Whitney* v. *Twombly*, 136 Mass. 145; *Thompson* v. *Kyner*, 65 Pa. 369; *McDonald's Estate* v. *McDonald* (Tex. Civ. App.), 150 S. W. 593; *Estate of Hallaway*, 195 Cal. 711, 733 [235 Pac. 1012].) It was said in *Guarantee Trust & S. D. Co.* v. *Waller*, 240 Pa. 575 [88 Atl. 13], that an instruction that ''less capacity is needed to make a valid will than is sufficient in most cases to transact ordinary business'' is a correct statement of the law.

[9] The second part of Dr. Mortensen's opinion, that wherein he says he does not believe testatrix was capable of making a will, has no probative value whatever in the absence of a showing that this learned disciple of Aesculapius was acquainted with the law's criteria of testamentary capacity. Indeed, when he says that in his opinion the testatrix was not able to transact any *important* business, *such as* the making of a will, he unmistakably betrays the erroneous notion that the ability to transact *important* business is an essential prerequisite to the possession of testamentary capacity. If, as in the *Estate of Russell*, 189 Cal. 759 [210 Pac. 249], the doctor had given an opinion respecting the testatrix's ability to understand those concrete facts the understanding of which the law makes requisite to a capacity to make a valid will, the situation then would have been altogether different. But

199 Cal.—49

here the doctor, in undertaking to say that the testatrix lacked the capacity to make a will, presumes to give an opinion upon a question which is one of mixed law and fact, to be decided by the jury under proper instructions from the court as to what is the legal test of testamentary capacity. (*Estate of Perkins, supra,* p. 710. See, also, *Estate of Taylor,* 92 Cal. 564 [28 Pac. 603]; *Conner* v. *Stanley,* 67 Cal. 315 [7 Pac. 723]; *McCracken* v. *McCracken,* 109 Or. 83 [219 Pac. 196].) It is a question the correct determination of which presupposes a knowledge of the law as to the requisites of testamentary capacity. There is not a scintilla of evidence to indicate that Dr. Mortensen had the faintest idea of what is the standard prescribed by law for the determination of that question. It is not at all improbable that, as a physician, he erroneously measured testamentary capacity by a more exacting standard of mental soundness than is required by the law. As has already been stated, in a medical sense insanity or unsoundness of mind is anything short of a mind wholly normal and free from a defective power of co-ordination; whereas the law does not demand such perfection to render one competent to manage his own affairs and to make a valid disposition of his property. (*Estate of Collins,* 174 Cal. 663, 670 [164 Pac. 1110].)

Another witness upon whose testimony contestant places much reliance is Philip Hooper, a nurse. While this witness was engaged in caring for patients whom he accompanied on their walks into the Santa Monica Canyon, he frequently saw and talked to Mrs. Sexton. He testified that he saw the testatrix about once every two weeks over a period of four months in 1914; that he saw her again at least twice a week from June to November in 1920; that when he saw her in 1920 he observed a decided change in her physical and mental condition; that at that time her mind appeared to be blank; that what he means by saying that her mind appeared to be blank is that when he would talk to her she apparently would not understand what he was saying or could not converse with him; that she would talk very little; that she was very reticent about answering questions and would shake her head and smile when questioned; that her physical condition was feeble; that he saw her in September of 1921; that at that time

her condition seemed to be much worse, in that she made no response at all when questioned; that it was very difficult to converse with her; that she was easily influenced to answer a question "yes" or "no" as the questioner wished, depending upon how the question was put. The witness also stated that in his opinion the testatrix was irrational in 1921.

Hooper's testimony is not necessarily irreconcilable with that testamentary capacity which the law presumes to exist until the contrary is established. [10] The opinions of lay witnesses have no greater probative force than the facts given by them as the bases for their conclusions. The facts from which the opinions are deduced are more decisive than the opinions. Now it seems that the decedent's vocal organs were so affected by the paralytic strokes that she could speak only with difficulty, and then not above a whisper. Who can say, then, that her reticence was not due to this physical condition rather than to any serious mental malady? By reason of the condition of her organs of speech and the physical difficulty which she experienced when she tried to talk, it was but natural that she should simply shake her head and smile when spoken to and be more than sparing of her words. And yet it was this very reticence, quite natural under the circumstances, which seems to have led this witness to the conclusion that her mind appeared to be a blank and that she was irrational. Without doubt Mrs. Sexton's mind was weakened by the strokes, and she doubtless was easily influenced to give to a question the answer desired by the interrogator. But this, while betokening an easy susceptibility to undue influence on the part of others, does not necessarily indicate that complete mental derangement which involves an utter incompetency to know and to understand those things which a testator must be able to know and to understand in order to possess testamentary capacity.

Contestant surely could not have believed that his wife's mind was so utterly feeble and unsound that she was incapable of understanding the nature of her testamentary act and appreciating its consequences; for upon a number of occasions intermediate the execution of the will and his wife's demise he procured her to join with him in the ex-

ecution of deeds which conveyed valuable parcels of community real property to third parties.

A further review of the testimony would only unduly prolong this opinion. Let it suffice to say that a careful consideration of the testimony of contestant's witnesses leaves in the mind the composite mental picture of a woman sixty-one years of age at the date of the execution of the will, grown old before her time, feeble in body, mentally weak and given to an habitual quiescence and a torpor peculiar to those who have suffered from cerebral hemorrhage. While a survey of all the facts may warrant a diversity of opinion as to the exact state of her mind and the precise degree of mental capacity retained by her, it is evident that there was not such a complete prostration or alienation of intellect as to incapacitate her from making a testamentary disposition of her property. The Kentucky court of appeals, speaking of a paralytic's will and addressing itself to a case similar to this in its main aspects, says: "It may be true that some of those who saw him [the testator] could not understand what he attempted to utter; and, nevertheless, he may not have been insane, unless the mind can never conceive what the tongue will not utter; and so every other fact stated for the defendants [contestants] may be reconciled with a disposing mind. . . . How muchsoever the muscular and nervous system may have been affected, it is hardly possible that the mind could have been paralyzed in an equal degree; for if it had been it was scarcely possible, as it seems to us, that he could have lived four years. . . . We cannot admit that a paralysis, however universally it may pervade the system, affects the mind equally with the body. It could not do so unless the mind were material. The mind derives its aliment from the body, through the senses; whilst any one sense remains, the mind can act rationally. . . . The nature of mind, and its mysterious connection with matter, are equally incomprehensible. . . . —the soundness and energy of the body are not always sure criteria of the sanity and force of the mind; and . . . many whose bodies have been prostrated by the most invincible lingering paralysis have still, in their physical desolation, enjoyed the light of reason. . . . As long as the body retains sensibility, the mind which animates it may remain sound. A

paralysis does not destroy sensation. It impairs muscular power, and prevents the organs of the body from obeying, implicitly, the will of the mind. It affects the mind in some degree, of course; but its ravages do not prostrate the action of mind and body in the same degree. The faculties of each do not sink *in pari passu.* That which is immaterial and self-evident, and which reasons, and thinks, and lives forever, does not always slumber when the body is powerless. It may be sane, though occasionally lethargic. It may be sound and active when the tongue, and the hand, and the eye, are incapable of motion; and may conceive and will what they refuse to execute." (*McDaniel's Will.* 25 Ky. (2 J. J. Marsh.) 331. See, also, *Rollins* v. *Smith,* 72 Cal. App. 773 [238 Pac. 171].)

If Mrs. Sexton's last will and testament be considered in the light of the fact that contestant is a man of affluence, it will be found to be just and equitable in all its provisions. According to the testimony of the proponents' witnesses, uncontradicted by any direct evidence to the contrary, the plan of the will was the product of decedent's own mind, uninfluenced by the advice or dictation of any other. The mind that so planned must have had testamentary capacity.

The order is reversed.

Shenk, J., Richards, J., Seawell, J., Waste, C. J., Sullivan, J., and Curtis, J., concurred.