[Civ. No. 12104.   First Dist., Div. Two.   Apr. 16, 1942.]

Estate of ALICE DOWNEY, Deceased.  AMERICAN TRUST COMPANY (a Corporation), as Executor, etc., Appellant, v. CHARLES MICKEY et al., Respondents.

A. W. Hollingsworth and Brobeck, Phleger & Harrison for Appellant.

Geary & Tauzer and A. Dal Thomson for Respondents.

STURTEVANT, J.—The will of Alice Downey, deceased, was admitted to probate on June 23, 1939, on the petition of American Trust Company, the executor named in her will. Thereafter Charles Mickey and several other persons, claiming to be heirs of the decedent, filed a contest on the ground of testamentary incapacity. Each and all of the contestants are nephews and nieces of Dr. Wallace Downey, the deceased husband of Alice Downey. The contest was heard before the trial court sitting with a jury. At the close of contestants' case the proponent moved for a nonsuit. The motion was denied. After the conclusion of the introduction of evidence the proponent moved for a directed verdict. The motion was denied. The jury returned a verdict in favor of the contestants. The proponent moved for judgment notwithstanding the verdict. The motion was denied. Thereupon judgment was entered on the verdict and the order admitting the will to probate was revoked on December 24, 1940. From the order of revocation the proponent has appealed.

Prior to the month of May, 1939, the decedent Mrs. Alice Downey had been residing in her home at Bay in Sonoma County, California. She was a widow and lived alone. But nearby Carl Engleman and his wife resided. Mr. Engleman acted as gardener for the decedent and did chores for her. Dr. Wallace Downey, the decedent's husband, died in 1937 and by his will he left all of his property to his surviving widow. Dr. and Mrs. Downey had no children but Dr. Downey left surviving him a number of nephews and nieces.

In the morning of May 8, 1939, when Mr. Engleman called at the home of Mrs. Downey, she was ill. When he entered

the house he found her lying on a couch suffering from a pain in the lower part of her abdominal cavity. The pain was so intense that she had remained on the couch all night and she was too ill to go to the door and open it or to speak loud enough for him to hear her. So he opened the door and walked in. Assisted by his wife he placed Mrs. Downey in her car, drove to Sebastopol, and took her to the office of Dr. Marsh. At that time Mr. Engleman testified she was "writhing" in pain. After making a preliminary examination Dr. Marsh directed the decedent to go immediately to Hillside Hospital in Sebastopol and he followed in a few minutes. The patient was put to bed and almost at once she was given an injection of morphine sulphate.

Dr. Marsh diagnosed the decedent's ailment as a disease of the kidneys. He found her to be in such severe pain that he could not operate. Therefore he directed such care and treatment as would build up the patient before an operation should be performed. The patient continued to suffer intense pain. Morphine sulphate was injected in one-quarter grain doses—on May 8, one dose; May 9, six doses; May 10, two doses; May 11, two doses; and on May 12, one dose at 3:30 a. m., one at 10 a. m., one at 1 p. m., one at 6:45 p. m., and one at 8:30 p. m. (As will later be noted the will in dispute was signed at about 8 p. m.)

From May 8 to May 13, the patient was at all times suffering pain and sometimes the pain was intense. The patient had severe vomiting spells commencing May 8, and continuing until after May 12. As shown by the charts she was irrational on May 10, also on May 11 and May 12. On the latter date the patient got out of bed at 3:30 a. m., and again at 6:30 a. m.

While in the operating room on May 12, 1939, at 6:45 p. m. a dose of morphine sulphate was injected by Dr. Marsh. At 7 p. m. she was taken to her bed. At 7:10 she was drowsy and bewildered when Mrs. Custard, the day nurse, left.

The contestants called Dr. Marsh as a witness. At the same time they produced and had in the courtroom the chart kept by the nurses at Hillside Hospital from the time that Mrs. Downey entered the hospital. They also had produced and had in the courtroom X-ray photographs. Among other things he testified as follows: "I first saw Mrs. Downey as a patient on May 8, 1939, at my office in Sebastopol, California. Later on the same day I saw her at the Hillside Hospital in Sebastopol. On that date I made an examination of her body. I was

not her doctor but I let her in one of the side rooms and took her temperature. The next day I made a diagnosis of her physical condition. She was cystoscoped in surgery. I found that she had pus coming from the bladder, that organ was quite inflamed. The mucous membrane was very swollen and inflamed and we passed a catheter through the ureter tubes leading from the kidney to the bladder. Her urine was colored. In the kidneys we injected an opaque material which made them show up in the X-rays. There was pus coming from the right kidney also. There was blood in the urine. She was running a fever and she had pain. The right kidney was badly dilated, four or five times the normal size and the examination showed there was a bad infection of that kidney. A cystoscope has two runways where small catheters, small hollow tubes, may be passed up into the kidney pelvis. We were able to do that on Mrs. Downey. We did so on the 9th of May, the day after she entered the hospital. Mrs. Downey suffered pain as the result of this examination and treatment. The passing of the catheter is a very painful procedure. She was in very great pain to start in with and naturally passing the instrument into the bladder, the passing of a catheter up into the ureter gave more pain. A catheter was left in place on the right side for drainage purposes. I also took X-rays of her body on the 20th. The X-rays are present. I took those X-rays myself. (Here the doctor read the X-rays to the jury.) Her condition on the 20th as compared to the 12th was very much worse. Mrs. Downey died May 31. Hospital records were kept with respect to her condition commencing with the 8th of May up to the date of her death. They are the records shown me as Exhibit 2. From time to time while Mrs. Downey was in the hospital under my care I examined those records. They were kept under my supervision. I gave the nurses who cared for Mrs. Downey instructions. One nurse was on general duty for several days. On May 12 she had a special nurse. On that day Mrs. Downey was very much worse and we put special nurses on because she started to get irrational. She seemed to be very much worse, that is the reason we put special nurses on—in order to give her better care. I was the doctor in chief on her case from the 8th until the date of her demise. I looked at the records from time to time. I prescribed on the 8th of May, 1939, narcotics for Mrs. Downey. I prescribed morphine sulphate. The nurse was directed to give her a quarter grain every four hours when necessary for pain. It was to be administered hypodermically. Charac-

terizing Mrs. Downey's illness on May 12, 1939, I would say she was desperately ill. On that date I finished surgery at 7 o'clock that evening. She was in surgery from 5 until 7. During that time she was given an injection of morphine sulphate by me about 6:45. On that occasion the cystoscope instrument which I have described was introduced into the bladder and catheters were passed. The catheters are about eighteen inches long. In diameter they range from the size of a small lead in a lead pencil to five or six times that size. So far as I could see the openings into the bladder were badly inflamed, each member was badly swollen. Putting those catheters into the bladder through the openings which were badly inflamed would cause still more pain. I don't recollect of her objecting, she kept moaning and groaning. To a person not so far advanced with this infection it is a painful process. Her condition on May 12, as compared with the 8th, 9th, 10th and 11th, was very much worse. She seemed to have more pain, she seemed to be more doped. She was taken to the surgery room and returned from it on a stretcher on wheels. She was very sick and naturally a person who has been as sick as she was, running a fever, and toxic from poisoning, and under the influence of morphine, she required aid to get back into bed. She was put to bed about 7 o'clock. At that time she was of sound mind probably but rather doped. Her condition was worse than it had been on the 8th. She was very much doped from having been in surgery. She was doped from the morphine and I would say she was rather doped and not very clear. *Her condition would not have improved within a half or three quarters of an hour after I left her.* Mr. Tauzer: Q. Now would you say that between the hours we will say of 7 and 8 o'clock Mrs. Downey in your opinion would be able to know the character, nature and extent of her property, the persons to whom she might determine to take her property, the natural objects of her bounty, and to understand the nature of a last will and testament that she made and allegedly signed? A. She wouldn't probably know the entire extent of it. Probably her mentality was dull from the effects of the morphine, therefore I would say that she was not capable of signing a will during that time. . . . Mr. Tauzer: Q. Would you state the reason for your opinion, Dr. Marsh? A. In the first place the woman was very toxic and sick. By toxic I mean by poison from the infected kidney circulating in the blood stream causing a fever, headache, drowsiness. That is separate from the effects that morphine

might have upon the individual. It is to start with. In the second place she was brought to surgery which is a very disturbing factor to such a sick person and led to a sort of a shocked state. It was a shock to the nervous system to be brought to the surgery. In the third place she had morphine. That would have the effect to make her drowsy. It affects the senses of sight, smell and taste and depresses the cerebrum—the centers of the intellect, the portion of the brain that we think with. She did not talk to me at all. She could have been aroused so that she could have understood a few words. In expressing my opinion I have taken into consideration the age of Mrs. Downey that would have an effect. A person as he grows older cannot withstand sickness or illness or shock like a younger person.

"On my direct examination I stated that Mrs. Downey was of sound mind. By that I meant that she wasn't crazy. The cause of the dopiness was not entirely the morphine. Her toxic condition and morphine were some of the causes of the dopiness. At seven o'clock the pain was lessening, the morphine would be taking more effect. The patient would be continuing to get more dopey and the pain would lessen. On the 12th the patient had not begun to develop a tolerance for morphine. In three days no one develops a tolerance for morphine. *I have stated what was her mental condition for an hour or so after I left the hospital.* That opinion was based upon the fact that she was in a toxic condition and had been given morphine at about 6:45. That enters into the opinion also. If I assume that at about 8 o'clock a draft of an instrument was read to Mrs. Downey and that she asked that certain changes be made in it, such fact would not change my opinion. The effect of the morphine starts in ten or fifteen minutes and continues for three or four hours. During two hours after the injection of morphine it should still be in full force as to the killing of pain and deadening the senses. In asking to have the instrument changed Mrs. Downey might remember an item or two but she might not remember everything. Under the influence of morphine a person isn't mentally clear, that is they are dopey. She might remember some property she had in the state and not remember that she had some in Sonoma County. When one is in a toxic condition and having a shot of morphine she doesn't know the full extent of her property. When she asked the draftsman to make a change that does not alter my opinion. She was able to remember certain pieces of her property or parcels of

property but I do not believe that she could have remembered all. *That opinion is based on my own observation of the patient. It is independent of the assumed directions given to the draftsman. If she had been aroused she might have recalled certain items of property but not the majority, character and extent of it.* At the time she gave directions to Mr. Hollingsworth she might have been capable of knowing and understanding that she was giving such directions. I would not go any further than to say she might have been. She might not even realize how much more she had. She might have known at that time that she was making that statement but under the influence of morphine she might have immediately forgotten about it. *My particular observation in this particular case had to do with my opinion.* When a doctor comes to see a patient the doctor doesn't just look at them and feel their pulse and look at their tongue and probably go in with a stethoscope. You try to get the patient in conversation. At no time during Mrs. Downey's illness was she communicative to me in any way. She was toxic during the entire illness and was more or less bad, didn't communicate to me, I couldn't even speak about the weather. She had no reply to make even about the weather. The fact that Mrs. Downey discussed trust companies and selected one to act as executor does not alter my opinion. She might have known that she was executing a will. She might not have realized that she was disposing of her property after her death. She might not have had the full realization of it. On May 12, the day the will was made, Mr. Hollingsworth did not call on me. He did call on me May 9. At that time I told him that Mrs. Downey was a very sick woman and if he wanted a will made it would have to be done very soon because she was very sick. On January 31, 1940, Mr. Hollingsworth and Mr. Burns called on me at my private office. At that time I made the statement that the nurses would in my opinion be the proper ones to state what Mrs. Downey's condition was at the time she made her will. I made that statement before reviewing the case, having it in mind. They called at the office and I didn't recall the particular case to mind. In using the expression irrational I mean it consists in disorientation as to time and place or what act the person is doing. For instance like getting out of bed, getting out of bed and running out of the hospital would be an irrational act, something that is unreasonable, no reason for doing so. That is a consideration of irrationality I think. A person that is delirious is certainly not rational.

"I mean by toxic a person absorbing the products of a poison or an inflammation in the system, the poisoning into the blood which makes them sick and causes headaches, fever, feeling of sickness. Mrs. Downey was suffering from a toxic condition May 12, 1939. That fact would have effect upon the influence of the morphine stopping her pain and dulling her other senses. *Her mental condition was based upon her toxicity due to her infection and also that she had a shot of morphine.* The morphine would still have its medicinal effect upon a person whose system was toxic. All of the senses would be dulled by morphine."

In connection with the testimony of Dr. Marsh as to the disorientation of the decedent on May 12, 1939, the contestants introduced the will showing the signature thereon. They also introduced many exemplars of decedent's signature. One was a check written the day before, May 11, 1939. The latter is remarkably regular and legible. The former consists of scratches so illegible they cannot be read.

Mr. Engleman testified that for a week after May 8, 1939, he visited the hospital daily. At the time he left Mrs. Downey at the hospital she asked him to care for Bum, her cat. He called on her each day at about noon. On the day the will was made he testified, "I couldn't hardly talk to her at all. I couldn't get her to answer a question intelligently. She would talk a little, and then lapse off unconscious. I stayed there four or five minutes. I tried to ask her a few questions and she would give me a part answer and I couldn't get no satisfaction so I walked out. In appearance she was very weak. She was very much weaker than the day I took her there. I wanted to get some feed for the cat, she was out of feed. She didn't know whether I was talking about a cat or what I was talking about. I told her that the canned salmon—she always fed him canned salmon—was all gone and what should I do. She just said, 'Bum out of salmon, Bum out of salmon,' something like that. On that day she was irrational."

Mrs. Edna Elphick who had charge of Hillside Hospital had a desk in the hallway opposite Mrs. Downey's room. She was at her desk when the will was being prepared. Mr. Hollingsworth called upon her to act as a witness. She went with Mr. Hollingsworth into Mrs. Downey's room and later signed the will as a witness. She testified that at the time Mrs. Downey signed the will the latter was partly irrational.

The proponent called Dr. A. A. Thurlow as an expert and propounded to him a long hypothetical question. Without at-

tempting to summarize his testimony it may be conceded for all the purposes of this decision that he expressed opinions at variance with some of the opinions expressed by Dr. Marsh. The proponent also called Miss C. N. Oliver, one of the nurses attending Mrs. Downey, who testified that she acted as one of the witnesses to the will and that Mrs. Downey was rational. Mr. Alex Sokol, a technician, went to the Hillside Hospital to take a blood test on the evening of May 12. He was an intimate acquaintance of the decedent. He also testified that the decedent was rational. Miss Bobst, the owner of Hillside Hospital, called at the room of Mrs. Downey between 7 and 7:30 and before the will was written. She testified that Mrs. Downey at that time was not in a stupor. John Reeder, a personal acquaintance of several years standing, called on Mrs. Downey May 10, and also on May 17. He testified that she seemed to be of sound mind on each day. Mr. Hollingsworth, the attorney who prepared the will, was an intimate acquaintance of the decedent and her husband. He also testified that at the time the will was executed the decedent was rational.

In its first point the proponent claims the burden of proof is always upon contestant to prove unsoundness of mind and such unsoundness as would be sufficient to invalidate a will. The contestants do not controvert the claim but assert they assumed the burden and established the fact that the decedent was of unsound mind when she made her will. (*Estate of Gill,* 14 Cal. App. (2d) 526 [58 P. (2d) 734].)

The proponent also asserts that the time to which the proof should have been directed was the time the will was executed. (*Estate of Nolan,* 25 Cal. App. (2d) 738 [78 P. (2d) 456].) That assertion is not controverted, but the contestants call attention to the fact that from the time the decedent left the operating room until at least three or four hours later she was incompetent. But it was during that period and only about one hour after she left the operating room that she made the will.

The proponent then quotes from *In re Redfield,* 116 Cal. 637, 655-656 [48 Pac. 794]: "It was the province and duty of the jury to draw the inference of fact from the evidence before them regulated by the rules of law stated to them by the court—being assisted but not superseded in that function by the opinions of experts. It is equally the duty of the court to determine whether there is any satisfactory evidence to

justify the conclusion they reached. . . ." No one would controvert that rule; and, from what has been said above, it is clear that the trial court followed it.

In connection with the last point the proponent contends that the opinion of a witness that a person is of unsound mind can be no stronger than or superior in evidentiary weight to the reasons upon which he bases his opinion. (*Estate of Campbell*, 46 Cal. App. 612, 621 [189 Pac. 812].) That is so, but it is equally true that the reasons given by Dr. Marsh were most convincing.

The proponent in its next point contends that the decedent had testamentary capacity. However, they admit the rule in this regard is correctly stated in *Estate of Sexton*, 199 Cal. 759 [251 Pac. 778]. On page 764 the court said: "A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument." But, in the instant case both counsel and the learned judge of the trial court seemed to have had that book and page before them at all times. The testimony on both sides was confined to said rule as written in that decision.

It is also claimed that the administration of morphine is not ground for overturning a will, nor are physical disability and age. No one in the instant case has claimed that, standing alone, they are. But it will be conceded that each is a factor to be considered.

Again the proponent claims that the evidence of Dr. Marsh that the decedent's condition would not and did not improve in one hour after he saw the decedent at 7 o'clock was unwarranted. We find no merit in the claim. It was purely a question of fact to be presented and proved by competent evidence and the question was for the jury to determine after all of the evidence was before it.

Because Mrs. Elphick signed the will as a witness the proponent contends that she stultified herself by giving evidence in the instant case, and that said evidence should not be considered. We find no merit in the contention. Shortly prior to the execution of the will she was at her desk in the hallway. Mr. Hollingsworth went out and asked her to come in and act as a subscribing witness. She demurred and asked him

if he thought Mrs. Downey was competent. He replied that Dr. Marsh said that she was. As Mrs. Elphick testified she did not set up her opinion against the opinion of Dr. Marsh. Later it transpired that whatever Dr. Marsh had said, his statement was made and had reference to the condition of Mrs. Downey on May 9, and had no reference to her condition on May 12. Under those circumstances Mrs. Elphick did not stultify herself by appearing as a witness.

█ In its reply brief the proponent quotes from *Estate of Casarotti,* 184 Cal. 73, 78 [192 Pac. 1085] : "Evidence which standing by itself might be sufficient to sustain a verdict may in the light of all the facts be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence." Thereupon they apparently claim that in a will contest the rules regarding the burden of proof are different than in other actions. We think they are mistaken. On page 75 of the cited case the court said: "There was no pretense that the testator was delirious, irrational, or insane or under any delusions. . . ." Clearly those are not the facts in the instant case. Furthermore, in *Estate of Ramey,* 62 Cal. App. 413, 425 [217 Pac. 135], the court said: "However, in will contests the rule is the same as in other proceedings, that all questions of the weight of the evidence and the credibility of the witnesses are for the jury and the trial court, and if there be any substantial evidence to support the finding or verdict it cannot be set aside by the reviewing court, although said court might believe the great preponderance of the evidence was the other way." See, also, *Estate of Miller,* 16 Cal. App. (2d) 154, 159-160 [60 P. (2d) 498]. The facts in the instant case are almost parallel with the case entitled *Estate of Gill, supra.* In that case, as in the instant case, it was claimed that the evidence was insufficient. However, the court held otherwise.

█ The proponent states facts showing the will was not "unnatural." It then quotes: "If the disposition made of his property is not 'unnatural,' or an apparent injustice is explained, the instrument is to be sustained, notwithstanding proof of insanity. . . ." (26 Cal. Jur. 632.) It cites in support of the text *Estate of Shay,* 196 Cal. 355 [237 Pac. 1079] ; *Estate of Casarotti, supra; Estate of Perkins,* 195 Cal. 699 [235 Pac. 45] ; *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932] ; *In re Redfield, supra.* An examination of those cases discloses that not one of them sustains the text relied on. If

insanity is proved the effect of the proof is determined by the rule we have hereinabove quoted from *Estate of Sexton,* 199 Cal. 759, 764 [251 Pac. 778]. Moreover there is nothing in any one of the cases cited in 26 Cal. Jur. 632 that is at all in conflict with the Sexton case.

The order appealed from is affirmed.

Nourse, P. J., and Spence, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 11, 1942.